860 A.2d 929 (2004)
373 N.J. Super. 29
Tami ROSALES, Petitioner-Respondent,
v.
STATE of New Jersey DEPARTMENT OF THE JUDICIARY, Respondent-Appellant,
v.
The Second Injury Fund, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued September 15, 2004.
Decided November 8, 2004.
*930 Michael O'Brien, Deputy Attorney General argued the cause for appellant (Peter C. Harvey, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Mr. O'Brien on the brief).
Frank S. Salzer, Toms River, argued the cause for respondent Tami Rosales (Mr. Salzer, of counsel and on the brief; Thomas W. Polaski, on the brief).
Respondent The Second Injury Fund has not filed a brief.
Before Judges KING, NEWMAN and HOLSTON, Jr.
The opinion of the court was delivered by
NEWMAN, J.A.D.
This appeal presents the issue of whether Workers' Compensation benefits should be offset by an ordinary disability retirement based upon the same disability. We are satisfied that the long-standing public policy prohibiting dual recoveries for the same disability require an offset. We are further convinced that the Workers' Compensation judge's findings of total disability are well-supported by the credible evidence in the record, but that the judge mistakenly delayed petitioner's payment of attorneys' fees and costs. We affirm in part and reverse and remand in part to make the necessary financial adjustments.

I.
Petitioner Tami M. Rosales (petitioner) was born on November 25, 1963. Her education includes an associate degree and credits toward a bachelor degree. She was hired by the County of Ocean as a clerk-typist in 1989. In 1991, petitioner developed severe pain in her right dominant hand. Following testing, she received a right carpel tunnel release in 1991. Dr. Martin Riss, petitioner's medical expert, found that after the first surgery, petitioner had a disability of forty percent of the right hand and twenty percent of the left hand. Dr. Gary Pess, a board certified hand surgeon, performed a second right carpel tunnel release and an ulnar nerve release on July 21, 1993. In 1994, petitioner had a left carpal tunnel release. Dr. Pess diagnosed petitioner with de Querevain tenosynovitis of the left wrist. Dr. Riss examined petitioner in 1994, and opined that her disability had increased to sixty-five percent of the right hand and forty-five percent of the left hand. Petitioner's complaints included pain and numbness in both hands, stiff fingers, restricted wrist movement, weak grasp, and an inability to open her right *931 hand completely. Her symptoms were aggravated by inclement weather. The symptoms continued to progress, and in June 1995, electrodiagnostic studies confirmed the continued presence of pressure on the right carpal tunnel.
On July 24, 1995, petitioner received her first Workers' Compensation award pursuant to claim number XX-XXXXXX. Judgment was entered against the County of Ocean providing for twenty-five percent of partial total disability for residual effects of "bilateral carpel tunnel syndrome with de Quervain's syndrome and ulnar nerve disability" stemming from occupational exposure from 1989 through 1991. In 1995, the county courts came under the jurisdiction of the State, and petitioner became a State employee, although her position and work responsibilities remained the same.
On September 20, 1995, petitioner filed claim number XX-XXXXXX against the State Treasury Department, Bureau of Risk Management (Risk Management), alleging that her continued occupational exposure with the State caused her hands and arms to develop increased disability. On October 18, 1995, petitioner underwent a revision of the right carpal tunnel release that she received in 1991 by receiving a right finger trigger release of her right thumb. She remained out of work until January 22, 1996, and then returned on light duty. Petitioner was examined by Dr. Riss on April 8, 1996, and her complaints included continued pain in her right wrist and thumb, loss of grip in her right hand, pins and needles in her fingers, tenderness in her right arm, use of a brace on her right wrist, and returning pain in her left hand as a result of overuse. Dr. Riss was of the opinion that she was totally disabled.
Petitioner was diagnosed with right cubital tunnel syndrome, and on August 14, 1996, Dr. Pess performed an ulnar nerve transposition.
On October 9, 1996, petitioner was examined by the State's medical expert, Dr. A. Gregory McClure. Petitioner voiced the same complaints to Dr. McClure that had been provided to Dr. Riss. Based on a review of the medical history, operative reports and examination, Dr. McClure determined that petitioner had a seven and one-half percent disability in her right arm.
On January 15, 1998, petitioner was again examined by Dr. Riss, who was of the opinion that the new surgeries resulted in a disability of forty-five percent of the right arm and thirty-five percent of the right hand, which reflected an improvement from his prior estimate of sixty-five percent in the right hand. He still held the view that she was totally disabled.
On April 15, 1998, Workers' Compensation Judge Apy entered a judgment for petitioner for forty-five percent of partial total disability on claim number XX-XXXXXX for "residuals of nerve impingement and de Quervaens Syndrome with bilateral carpel tunnel release followed by right ulnar nerve release, right median nerve and trigger thumb release and flexor tenosynovectony with status post anterior transposition and nuerolysis right ulnar nerve at right elbow." Risk Management received credit for the July 25, 1995 judgment entered against the County of Ocean for twenty-five percent of partial total disability.
Petitioner testified that after her receipt of the April 1998 award, her job was changed to a light duty position as a receptionist for the Superior Court. Her responsibilities included working at a reception counter tending to individuals requiring servicing from the courts. She frequently made photocopies, worked on a computer and answered and transferred calls from a main switchboard which had *932 three telephone lines. She was relieved of retrieving tightly packed files since that activity worsened her symptoms. She no longer had to open the mail, but still sorted and documented it. Shortly before she stopped working, at her request, she was provided with a telephone head set to facilitate multi-tasking. She often required assistance from her co-workers and needed frequent breaks.
Petitioner returned to Dr. Pess on October 13, 1998, complaining of numbness from the side of her neck radiating down her shoulder and pain in her arms, hands and fingers. She continued in his care and was sent for an EMG and nerve conduction studies on March 2, 1999, which disclosed left ulnar neuropathy at the elbow site. On March 4, 1999, petitioner filed an application for review of the April 1998 award, seeking additional compensation on the basis that her condition had worsened. Risk Management denied the application. On that same date, petitioner filed claim number XX-XXXXXX for the consequences of her occupational exposure from April 1998 until the filing of that claim. Risk Management denied that claim as well.
On April 6, 1999, an EMG and nerve conduction study of the right upper extremity showed a right median nerve disorder at the wrist. Compared to the June 1995 study, there was a mild worsening of the carpel tunnel syndrome, but some improvement of the right ulnar nerve neuropathy. On May 25, 1999, Dr. Pess administered injections of Xylocaine and Celestone to petitioner's right hand, which resulted in minimal relief. On July 1, 1999, an x-ray of petitioner's right shoulder revealed "possible calcific tendonitis of the greater tuberosity." An MRI of the cervical spine was performed on July 8, 1999, which revealed no abnormalities. On September 14, 1999, petitioner received another injection of Xylocaine and Celestone to her right hand.
On September 28, 1999, she was again examined by Dr. McClure. He found a full range of motion of both arms, and no objective findings to support the complaints of petitioner, who he considered a symptom magnifier. He found there was no change in the disability of the right arm from his previous estimate of seven and one-half percent. However, as a result of the nerve conduction studies, he found a five percent disability of the left arm. He opined that she could return to work, but that she should be restricted from "highly repetitive or highly forceful work" and could not perform beyond a light duty position.
In an October 5, 1999 report, Dr. Pess stated that petitioner would be unable to perform her work duties due to pain in her wrist and elbow. He was of the opinion that her condition would never improve to a degree where she would be able to perform her work duties, and that her injuries were caused by occupational exposure due to repetitive motion.
On October 5, 1999, petitioner filed an application for an ordinary disability pension. On October 13, 1999, she filed a verified petition in which she alleged that she was entitled to benefits under the Second Injury Fund (SIF), to commence when her Workers' Compensation benefits expired. SIF is a Special Compensation Fund that makes benefit payments to workers already partially disabled who subsequently experience a work related injury which when combined, render them totally disabled.
Petitioner worked until November 1999 when she reached ten years of employment and had the minimum time needed to qualify for an ordinary disability pension. The ordinary disability pension was made effective on December 1, 1999, and she *933 received forty percent of her average wage, or $673.49 per month (on November 1, 2001, all ordinary disability pensions were increased to 43.6% of the final wage). Her contributions of $6440.61 yielded an annuity of $79.34 per month, and the Public Employee Retirement System's funded portion was $594.56 per month. Petitioner also filed for Social Security disability, which was initially denied, but granted in July 2001 with payments made retroactive to May 1, 2000.
On January 10, 2000, Dr. Riss examined petitioner for the final time. He again opined that petitioner was totally disabled due to her impairment of mobility and loss of grip strength. He found that her total disability had existed since 1996, and had worsened over time. He found that the loss of function in her left hand was the same as he found in 1998, except for minor changes in supination and flexion; the right hand had minor changes in supination and extension. The only change in the loss of function in the right and left arms was a minor change on supination.
On January 24, 2002 Workers' Compensation Judge Moncher rendered an initial decision regarding petitioner's three claims: the application for review and modification of the April 15, 1998 award, claim number XX-XXXXXX for her occupational exposure from April 1998 to March 4, 1999 and the petition for benefits under the SIF. Testimony by petitioner, Dr. Riss and Dr. McClure was provided over the course of several months. The trial was held pursuant to the SIF bifurcation rule N.J.A.C. 12:235-5.1(e) (recodified from N.J.A.C. 12:235-7.2 and amended by 34 N.J.R. 364(d) effective October 21, 2002). That rule provides for an initial trial with only petitioner and the employer's attorney on the issues of compensability and total disability, while the issue of SIF liability is determined later with the participation of a Deputy Attorney General (DAG) representing the fund. Ibid.
During the trial, petitioner testified that while her job made her symptoms worse, she continued to work to support herself and her child. She further testified that she did not want any additional surgeries because she felt the surgeries only worsened her condition. Additionally, she stated that she had not pursued new employment since every job that she was qualified for involved use of her hands. She indicated that she engages in limited housework with the assistance of her son, and is not able to maintain her house as she once did.
On January 2, 2002, Judge Moncher found that petitioner was totally and permanently disabled and was unlikely to ever improve. His award of benefits was as follows:
I have found that petitioner is totally permanently disabled following manifestation of permanent disability from her last compensable injury and that she is most likely eligible for Second Injury Fund benefits. Therefore, pursuant to N.J.A.C. 12:235-7.2, et seq., I am entering an interim order directing the respondent to begin payment of total permanent disability effective January 1, 2002 at the weekly benefit rate reduced for Social Security Benefits until further order of this tribunal. See N.J.A.C. 12:235-7.2.
Petitioner's wage for the prior judgment against [S]tate was $305.23 yielding a total disability rate of $213.66 per week. Her wage for the 1999 claim was $470.27, yielding a total disability rate of $329.18 per week. As seen below her weekly benefits are capped by operation of the Social Security reverse offset until age 62, some 24 years hence. No matter which wage governs her award, her weekly benefit in Workers Compensation will be the same.

*934 Petitioner's 80% [average current earnings] as reported by the Social Security Administration was $1468 per month. Her initial award of Social Security Benefits, effective May 1, 2000 was $708 and she receives an auxiliary benefit of $354 per month for her son Andre, date of birth September 22, 1992. Subtracting the total family benefit of $1,062 from $1,468 yields a difference of $308 per month as the maximum compensation benefit payable at this time. N.J.S.A. 34:15-95.5. This number times 12, divided by 52 gives a weekly benefit of $93.69. When her son's social security ends, the weekly Workers' Compensation disability benefit shall increase to $175.39 until her 62nd birthday.
On January 29, 2002, the second hearing to determine SIF liability was held. The DAG, representing Risk Management and SIF, stated that no further facts on the liability issues would be presented. Judge Moncher found that Risk Management's liability began to accrue on December 1, 1999, after petitioner left the state payroll, and not on January 1, 2002 as he initially found in his opinion of January 2. He held that petitioner's Workers' Compensation benefits would still be subject to offset by her receipt of Social Security disability which began on May 1, 2000. Risk Management's liability would continue until August 29, 2004. He found there was SIF liability, which would be payable at the same rate as Risk Management's liability beginning on August 31, 2004.
At the second stage of the SIF hearing, Risk Management contended that petitioner should not be receiving Workers' Compensation benefits since she had received an ordinary disability pension from the Public Employees' Retirement System (PERS). On September 23, 2002, Judge Moncher rejected Risk Management's assertions that petitioner's benefits should be canceled because she was receiving an ordinary disability pension from PERS. Judge Moncher concluded that the clear intent of the pension statutes is to provide an offset of Workers' Compensation benefits for an accidental disability pension only.
Judge Moncher held that petitioner's attorney's costs and fees should be payable by both Risk Management and petitioner, with Risk Management paying a significantly larger portion. He also ruled that even though petitioner would be paid Workers' Compensation benefits on a total disability basis as of December 1, 1999, she would not begin to contribute toward her share of attorney's fees and costs until May 1, 2000, the date that she became eligible for Social Security disability. Pursuant to 42 U.S.C. § 424a, this delayed the offset that Risk Management would receive for petitioner's receipt of Social Security disability.
On appeal, Risk Management raises the following issues for our consideration:
POINT I
THE AWARD OF PERMANENT DISABILITY MUST BE OFFSET BY THE DISABILITY PORTION OF THE ORDINARY DISABILITY PENSION IN ORDER TO SATISFY THE LONGSTANDING AND STRONG PUBLIC POLICY WHICH PROHIBITS DUAL RECOVERIES FOR THE SAME INJURY.
POINT II
THE JUDGE OF COMPENSATION EXCEEDED HIS AUTHORITY WHEN HE RULED HE WAS NOT BOUND BY THE SUPREME COURT'S INTERPRETATION OF THE 1995 AMENDMENTS TO N.J.S.A. 34:14-43 NOR THE LEGISLATIVE AMENDMENTS IN 1997 AND 1999 BECAUSE THE LEGISLATURE, IN THE JUDGE'S OPINION, *935 WAS UNAWARE OF ITS OWN ACTIONS AND NOT INTENTIONALLY BARRING DUAL RECOVERIES.
POINT III
THE DECISION OF THE JUDGE OF COMPENSATION MUST BE REVERSED BECAUSE THERE IS NOT SUFFICIENT CREDIBLE FACTUAL EVIDENCE IN THE RECORD TO CAUSALLY CONNECT THE PETITIONER'S CONDITION TO HER NEW OCCUPATIONAL EXPOSURE AND THE DETERMINATION OF TOTAL DISABILITY IS NOT BASED UPON SUFFICIENT OBJECTIVE MEDICAL EVIDENCE SINCE IT IS BASED UPON THE NET OPINION OF THE PETITIONER'S MEDICAL EXPERT.
POINT IV
THE JUDGE OF COMPENSATION ABUSED HIS DISCRETION BY REQUIRING A DELAY IN THE PAYMENT OF FEES AND COSTS UNTIL AFTER THE START OF THE SOCIAL SECURITY AWARD IN ORDER TO ENHANCE THE PETITIONER'S AWARD AT THE EXPENSE OF THE STATE OF NEW JERSEY.

II.
Risk Management contends that based on the strong public policy of this state to prohibit double recovery for the same injury, petitioner's Workers' Compensation benefits should be offset by her ordinary disability pension. We agree.
The longstanding public policy of N.J.S.A. 34:15-43 prohibits the dual recovery of both pension benefits and Workers' Compensation benefits for the same disability. N.J.S.A. 34:15-43 was first amended in 1931 to prohibit the receipt of Workers' Compensation benefits when one was awarded a disability pension. The statute was amended in 1948 to add the sentence which required an employer to continue to provide medical care for a work related injury even if one was receiving a disability pension.
From 1948 to 1996, N.J.S.A. 34:15-43 read in pertinent part:
No former employee who has been retired on pension by reason of injury or disability shall be entitled under this section to compensation for such injury or disability; provided, however, that such employee, despite retirement, shall, nevertheless, be entitled to the medical, surgical and other treatment and hospital services as set forth in R.S. 34:15-15.
The public employee retirement systems contained very similar language concerning how they are affected by a Workers' Compensation award for the same injury. For instance, prior to the 1971 amendments the Police and Firemen's Retirement Fund, N.J.S.A. 43:16A-15.2b stated,
No application for retirement benefits may be approved by the board of trustees while the member applying for such benefits, is in receipt of periodic benefits under the Workers' Compensation Law.
This created a dilemma for public employees who could retire immediately but would then be precluded from seeking Workers' Compensation benefits. In the alternative, a worker could collect Workers' Compensation benefits immediately but would be precluded from collecting a disability pension until the compensation benefits ran out. The employee often could not know in advance which award would be greater but would still be limited to the option initially selected.
Attempts by the Legislature to amend N.J.S.A. 34:15-43 to allow the recovery of both the full Workers' Compensation award and the disability pension met with *936 gubernatorial veto. See S.391 (January 27, 1969); S.441 (January 26, 1970). The various pension systems did modify their statutes in 1971 to provide for an actuarial offset of both accidental and ordinary disability pensions when one received Workers' Compensation benefits for the same injury as the pension. Leoni v. Township of Hamilton, 134 N.J.Super. 231, 235-36, 339 A.2d 222 (App.Div.1975).
The Supreme Court in Conklin v. City of East Orange, 73 N.J. 198, 373 A.2d 996 (1977), resolved the effect that the 1971 pension amendments had on N.J.S.A. 34:15-43. That statute still barred recovery of Workers' Compensation benefits while one was in receipt of a disability pension. The Court ruled it did not matter which benefit was awarded first as long as there was an offset. The Court recognized "[t]he statutory purpose is to allow the employee the more advantageous of the respective benefits, but to require the off-set heretofore mentioned in order to avoid double recovery for the same disability." Id. at 205, 373 A.2d 996. While the Court's decision was at odds with the then language of N.J.S.A. 34:15-43, the Court found the failure to amend N.J.S.A. 34:15-43 "was inadvertent" and that the ruling would modify section 43 to meet the Legislature's implied intent to avoid dual recoveries. Id. at 204, 373 A.2d 996.
In 1977, the Legislature amended N.J.S.A. 34:15-29 to state
The right of compensation granted by this chapter may be set off against disability pension benefits or payments but shall not be set off against employees' retirement pension benefits or payments.
The original bill, Assembly No. 1309, and the sponsor's statement sought to bar a set off against both service and disability pensions. See Labor, Industry and Professions Committee Statement to A.1309 (January 19, 1976). In its final form, the bill limited the final bill offsets to disability pensions. In Young v. Western Electric Co., 96 N.J. 220, 475 A.2d 544 (1984), our Supreme Court noted the amendment recognized the Division of Workers' Compensation's jurisdiction to offset benefits from a disability pension and it reflected "an underlying theme of the Workers' Compensation law is that there should not be duplicative payments for the same disability." Id. at 231, 475 A.2d 544.
The pension rules were amended in the public pension systems in 1994 to change offsets of accidental disability pensions from an actuarial offset to a dollar for dollar basis when there is a Workers' Compensation award. However, the Division of Pensions no longer sought to take an offset of ordinary disability pensions, N.J.A.C. 17:1-4.32.
N.J.S.A. 34:15-43 was amended in 1995, eliminating language which barred any recovery of Workers' Compensation if one was already receiving a disability pension. The legislative statement to Assembly Bill No.1977 described the amendment as one "for consistency with court decisions and the pension systems' offset provisions, the amendments delete from the [W]orkers' [C]ompensation law a sentence which prohibits altogether the receipt of [W]orkers' [C]ompensation benefits by a retirant receiving a disability retirement allowance." Assembly Appropriations Committee Statement to A.1977 (December 8, 1994). A few weeks later, the statute was amended to add the second paragraph which granted Workers' Compensation coverage to emergency management personnel but also provided that any benefits would be offset by any collateral benefits. L. 1995 c. 383 (1996).
In Bunk v. The Port Authority of New York & New Jersey, 144 N.J. 176, 676 A.2d 118 (1996), the Supreme Court referring to *937 the recent amendment considered the "amendments primarily to be a clarification of existing law, not a change in settled law." Id. at 194, 676 A.2d 118. The amendment was "not intended to rescind the longstanding equitable bar against double recovery." Id. at 192-93, 676 A.2d 118. The dominant policy and "central theme of recent Legislatures," as the Court observed, was "that there should not be a double recovery from two sources for the same injury." Id. at 189, 676 A.2d 118. The Court said "[t]hese amendments appear to be recognition of the gradual developments in case law that permitted employees to select the more advantageous of the benefits." Id. at 192, 676 A.2d 118.
N.J.S.A. 34:15-43 was next amended in 1999. Assembly Bill No. 2302 added additional types of volunteers to the second paragraph. The bill also returned to the statute the exact same pension bar language which was deleted in 1995. It is entirely possible that this may have been done inadvertently since the pension bar language was not underlined in the proposed bill; nevertheless, it was part of the final bill which was enacted and signed into law by the Governor.
The sponsor's statement to Assembly Bill No. 2302, which became one of the 1999 amendments, said the purpose of the amendment was to give the volunteers and other emergency management individuals mentioned in paragraph two of N.J.S.A. 34:15-43 the "same salary, pension rights and other benefits as if the injury or death had occurred in the jurisdiction where those persons are normally employed." Assembly Law & Public Safety Committee Statement to A.2302 (December 3, 1998). Paragraph two of N.J.S.A. 34:15-43 still stated the volunteer's benefits "shall not be paid to any claimant who has another single source of injury or death benefits...." This other source does not exclude disability pension benefits. If these volunteers' award can be offset, and they have the same "pension rights" as others, it is evidence that the offset or double recovery prohibition applies to all employees.
One of the basic concepts in our Workers' Compensation scheme can be found in N.J.S.A. 34:15-40, which bars double recoveries from Workers' Compensation and third party recoveries. Ibid. Nor does it matter if the recovery is as a result of medical or legal malpractice or if the source of the recovery is from private insurance such as uninsured or underinsured motorist protection. Frazier v. New Jersey Manufacturers Insurance Company, 276 N.J.Super. 84, 647 A.2d 472 (App.Div.1994), aff'd 142 N.J. 590, 667 A.2d 670 (1995). Even where liability claims against employers were due to their intentional misconduct, offsets were called for when the liability and Workers' Compensation awards overlapped. Millison v. E.I. duPont de Nemours & Co., 101 N.J. 161, 187, 501 A.2d 505 (1985).
In In Re Application of Howard Smith, 57 N.J. 368, 273 A.2d 24 (1971), our Supreme Court, in approving the bar of Workers' Compensation when a retirant is receiving a pension, recognized that there is an implied legislative mandate against double recovery. The Court put it this way:
But no matter how sympathetically the employee's interest are viewed, the judiciary cannot ignore the legislative intention which plainly emerges from the total statutory treatment of the subject. Such intention must be given sensible application in order to accomplish the indicated purpose and to avoid a bizarre result.
[Id. at 380, 273 A.2d 24.]
*938 We analyzed in Leoni v. Township of Hamilton, supra, the interplay between N.J.S.A. 34:15-43 and the pension statutes after the pension statutes were amended to allow an actuarial offset of the pension from a Workers' Compensation award. There, we observed that N.J.S.A. 34:15-43 and the pension statutes were not amended at the same time but nonetheless the pension amendment must be read "in pari materia" with the Workers' Compensation Act to allow the offset. Id. at 236, 339 A.2d 222. We said:
The construction which we have given to the statutes comports with the laudatory purpose of the Workmen's Compensation Act and the pension disability provisions and at the same time precludes the double recovery of benefits referred to in Smith, supra and Russo, [v. Teachers' Pension and Annuity Fund,] supra [62 N.J. 142, 299 A.2d 697 (1973)]. Indeed, in our view, it accords with the underlying philosophy of Smith.

[Id. at 237, 339 A.2d 222.]
Conklin v. City of East Orange, supra, resolved the interplay between the Workers' Compensation and the pension statutes. The Court noted that the fact that N.J.S.A. 34:15-43 was not amended was "inadvertent" and the statute would be modified to be consistent with the Legislature's intent to prevent double recoveries. Id. at 204, 373 A.2d 996. In no uncertain terms, the Court said the offset
applies whether the retirement is for accidental disability or, as here, ordinary disability ... The statutory purpose is to allow the employee the more advantageous of the respective benefits, but to require the offset heretofore mentioned in order to avoid double recovery for the same disability.
[Id. at 205, 373 A.2d 996 (citation omitted).]
N.J.S.A. 34:15-29 was amended after the Conklin decision to expressly grant Workers' Compensation judges the power to offset a Workers' Compensation award by a disability pension. The Court in Young v. Western Electric Co., supra, acknowledged that the amendment implicitly recognized the Division's jurisdiction to make offsets of disability pension benefits against compensation awards for partial permanent and total permanent disability and a policy supporting integration of compensation awards and pension plans. See 96 N.J. at 220, 475 A.2d 544. Rejecting the argument that N.J.S.A. 34:15-29 only applied to accidental disability plans or that only the pension could be reduced the Court stated,
The amendment may be read literally to provide only that disability pension benefits can be reduced, but not the compensation award. Such a reading is counterproductive to the workers' compensation scheme; it would encourage employers to delay payment of disability pension benefits until the compensation awards had been determined. It is doubtful that the Legislature had any such intent. Rather an underlying theme of the workers' compensation law is that there should not be duplicative payments for the same disability.... The sense of the Act is that compensation awards, as well as disability pensions may be reduced depending on the timing and amounts of the respective payments. Our interpretation accords with the settled statutory interpretive guide that the letter should give "way to the obvious reason and spirit of the expression."
[Id. at 230 to 231, 475 A.2d 544 (citation omitted).]
Wright v. The Port Authority of New York & New Jersey, 263 N.J.Super. 6, 621 A.2d 941 (App.Div.), certif. denied, 133 *939 N.J. 442, 627 A.2d 1147 (1993), which resembles the present case, involved the Second Injury Fund and a claimant who was receiving a public accidental disability pension which did not provide for any offset due to a New Jersey Workers' Compensation award. The Second Injury Fund's Deputy moved for an offset of the Workers' Compensation award based upon N.J.S.A. 34:15-29 and N.J.S.A. 34:15-43. Id. at 9, 621 A.2d 941. The motion was denied and the Fund appealed. Ibid. Relying upon Conklin and N.J.S.A. 34:15-43, this court ruled that the employer could offset the Workers' Compensation award by the disability pension. Id. at 24, 621 A.2d 941. We pointed out that to do otherwise the claimant would receive almost two times his salary from a combination of Social Security disability, pension benefits and Workers' Compensation. Id. at 14, 621 A.2d 941.
Bunk v. Port Authority of New York & New Jersey, supra is, in our view, dispositive of the issue presented here. In Bunk, a public ordinary disability pension which did not provide for an offset of a Workers' Compensation award for the same injury was decided after N.J.S.A. 34:15-43 was amended in 1995 and the Court specifically addressed this amendment's impact upon offsets. Id. at 193, 676 A.2d 118. The Court found the amendments were "not intended to rescind the longstanding equitable bar against double recovery." Ibid.
The Court stated that the offset would apply even though "[g]ranted, there is no provision in the PA pension requiring or allowing setoff, the question to us is one of legislative intent." Id. at 189, 676 A.2d 118.
More recently, James v. Public Employees' Retirement System, 164 N.J. 396, 753 A.2d 1061 (2000), citing Bunk, supra as controlling, said,
Work-disabled employees are to be able to achieve the most advantageous combination of [W]orkers' [C]ompensation and pension benefits without offending our strong public policy against the award of double benefits for the same disability.
[Id. at 410-11, 753 A.2d 1061.]
So too here. If there is no offset, petitioner could receive between her pension, Workers' Compensation award and Social Security disability benefits a total of 120% of her full salary. With cost of living increases and recent changes in the pension law, that benefit presently exceeds 120% of salary. Aside from the prohibition of a double recovery, the result here would be even more egregious because the retirant would actually receive more compensation retired than she would have received had she been able to continue working. Such a bizarre result puts a premium on not working which clearly undermines public policy. We, therefore, are convinced that N.J.S.A. 34:15-43 proscribes receipt of both a Workers' Compensation award and an ordinary disability retirement based on the same injury and resulting disability. The offset must be utilized.
[We do not publish section III of our opinion because the guidelines for publication are not met. R. 1:36-2(d).]

IV.
Risk Management contends that Judge Moncher mistakenly exercised his discretion by finding that petitioner would not begin to pay attorney's fees and costs until May 1, 2000, the date she became eligible for Social Security disability, and not on December 1, 1999, the date she became eligible for Workers' Compensation benefits payable on a total disability basis. Judge Moncher ordered as follows:
Permanent total disability shall begin on December 1, 1999 at $329.19 per week until April 30, 2000 without offset. *940 Commencing May 1, 2000, she will continue to receive $329.18 per week until she has accrued sufficient monies to equal her share of counsel fees, allowances and costs. This postponement of the Social Security offset is required so that this reduction not exceed that allowed by 42 U.S.C. § 424a. See N.J.S.A. 34:15-95.5. After sufficient monies are accrued, her benefits payable by the [sic] Risk Management shall be at $93.69 until August 29, 1904[sic] or [20]04.
N.J.S.A. 34:15-64 authorizes the Judge of Compensation to assess attorney fees and costs. N.J.S.A. 34:15-26 directs that these assessments will be deducted from the weekly compensation benefits as they accrue. Attorney fees in Workers' Compensation cases are routinely paid from the initially accrued Workers' Compensation benefits. N.J.S.A. 34:15-16 requires that compensation for all classes of injuries are to run consecutively. We have not found statutory authority for the judge to delay the payment of attorney fees until six months after the permanent disability award commenced.
The assessment of fees and costs was apparently delayed so that petitioner's full permanent disability rate would continue longer without any offset. This is based upon 42 U.S.C. § 424a which prohibits any reduction in an award while attorney fees and costs are being paid. Similarly, 20 C.F.R. § 404.408(d) prohibits any reduction in the award due to "medical, legal or related expenses in connection with the claim." These rules are designed to preclude a dual deduction from an award. A disability award is only reduced by funds actually received by the injured party and not from funds used to pay fees and costs.
These rules were not intended to enhance an award at the expense of the employer. If the Workers' Compensation award here was paid in the same manner as all other Workers' Compensation awards, the fees and costs would have already been paid in full prior to the effective date of the Social Security award. Therefore, the Social Security offset would have begun immediately without any further delay.
Since the payment was arbitrarily delayed until May 1, 2000, the State was required to pay 19-1/7 weeks at the full $329.19 rate rather than the offset rate of $93.69 between May 1, 2000 and September 12, 2000 as required by the court's order. The fee award should be adjusted so that the attorney fees and costs are paid from benefits that commenced to accrue on December 1, 1999, the date total disability began.
Affirmed in part; reversed and remanded in part for further proceedings consistent with this opinion.