955 A.2d 940 (2008)
402 N.J. Super. 546
FINDERNE MANAGEMENT COMPANY, INC., Rocque Dameo and Daniel Dameo, Plaintiffs-Appellants/Cross-Respondents,
v.
James W. BARRETT, Gerard T. Papetti and U.S. Financial Services Corporation, Defendants-Respondents/Cross-Appellants, and
CIGNA Financial Advisors, Inc., Lincoln National Life Insurance Company, Ronn Redfearn, Steven G. Shapiro, Tri-Core, Inc., Monumental Life Insurance Company, and Inter-American Insurance Company of Illinois, Beaven Companies, Inc., CJA Associates, Inc. and Raymond J. Ankner, Defendants.
No. A-1057-05T5
Superior Court of New Jersey, Appellate Division.
Argued November 28, 2007.
Decided September 9, 2008.
*944 Steven J. Fram, Haddonfield, argued the cause for appellants/cross-respondents (Archer & Greiner, P.C., attorneys; Mr. Fram, of counsel; John C. Connell and Tara S. Parvey, on the brief).
Christopher P. Leise, Cherry Hill, argued the cause for respondent/cross-appellant James W. Barrett (White & Williams, L.L.P., attorneys; Mr. Leise, of counsel; Edward M. Koch, Philadelphia, PA, on the brief).
Bruce S. Edington, Newark, argued the cause for respondents/cross-appellants Gerard T. Papetti and U.S. Financial Services Corporation (Seiden Wayne, L.L.C., attorneys; Mr. Edington, of counsel; Benjamin C. Curcio, on the brief).
Richard Hertzberg, Woodbridge, argued the cause for respondents Beaven Companies, Inc., CJA Associates, Inc. and Raymond Ankner (Greenbaum, Rowe, Smith & Davis, L.L.P., attorneys; Mr. Hertzberg, of counsel; David T. Shivas, on the brief).
Before Judges CUFF, LISA and LIHOTZ.
The opinion of the court was delivered by
LIHOTZ, J.A.D.
Plaintiffs Finderne Management Company, Inc. (FMC), Rocque Dameo and Daniel Dameo seek recovery of losses alleged to result from false and misleading representations by defendants James W. Barrett, Gerard T. Papetti and Papetti's company, U.S. Financial Services Corporation, (defendants or Barrett and Papetti). Defendants induced plaintiffs to establish what they represented was a "tax qualified," "419 annuity" by participating in a program known as the Employers Participating Insurance Cooperative (EPIC). EPIC purported to be a multiple employer welfare benefit plan and trust that provided employers with a tax-deductible vehicle to fund pre-retirement death benefits for owner-employees through the purchase of specific life insurance products, and allowed the individual insured to convert the insurance policy to obtain post-retirement benefits.
Six years after FMC commenced participation in EPIC, the Internal Revenue Service (IRS) audited the company and disallowed claimed deductions for two tax years. As a result of the IRS audit, plaintiffs paid additional taxes and interest deemed due. Thereafter, plaintiffs terminated participation in EPIC.
Plaintiffs' complaint asserts various misrepresentation claims, sounding in negligence and fraud.
They argue that defendants misrepresented the tax consequences of the benefit plans to induce plaintiffs to purchase life insurance. Plaintiffs allege that while [defendants] earned millions of dollars in commissions from the insurance sales, plaintiffs lost substantial sums of money because the IRS decided that plaintiffs' contributions were not tax deductible. Plaintiffs claim that defendants knew of the potential adverse tax consequences, and not only failed to tell plaintiffs, but affirmatively represented that the contributions would be tax deductible.
[Finderne Management Co., Inc. v. Barrett, 355 N.J.Super. 170, 190, 809 A.2d 842 (App.Div.2002), certif. denied, 177 N.J. 219, 827 A.2d 287 (2003) (Finderne I).]
The matter was tried to a jury. The trial judge entered an order of judgment molding the verdict and fixed liability against Barrett and Papetti, each in the amount of $36,734.60.
Plaintiffs appeal from numerous pre-trial and trial orders, asserting legal errors *945 that warrant a new trial. Two specific arguments challenge the orders that dismissed plaintiffs' consumer fraud claims and limited the scope of damages. Also, in a permitted supplemental brief filed following entry of a trial court order upon our grant of a limited remand, plaintiffs challenge the denial of their motion to set aside the judgment under Rule 4:50-1(c).
Defendants Barrett and Papetti cross-appeal from the denial of their respective summary judgment motions and certain evidentiary trial rulings. Finally, defendants appeal from the post-trial denial of their request to award counsel fees following plaintiffs' rejection of a pre-trial offer of judgment. We affirm on all issues.

I
FMC operates a Bridgewater trucking business and is owned by brothers Rocque Dameo and Daniel Dameo. Since 1977, Barrett, a Senior Account Executive at Cigna Financial Advisors, Inc. (Cigna) provided financial advice and sold life insurance to the Dameos. In the late 1980s, Barrett suggested the Dameos develop a business succession plan to consolidate their companies and to minimize estate taxes in the event of the death of either brother. The Dameos held significant wealth in the value of their business interests, but had "a very serious problem" with asset liquidity to pay anticipated death taxes in the event one brother passed away. Furthermore, the Dameos had terminated an existing retirement vehicle so they had no program to provide for retirement. The brothers agreed that additional estate planning strategies "such as retitling assets, new wills, new trusts, and some other financial planning" techniques were necessary to "reduce the estate tax[es] down to a meaningful level" and, in planning for their retirement, to provide a "seamless" transfer of the business to family members while affording them, as former owners, a sufficient stream of retirement income.
Barrett introduced the Dameos to Papetti who was a personal financial planner, licensed insurance agent, and certified public accountant. Together, Barrett and Papetti performed a comprehensive review of the Dameos' financial concerns, including available cash flow and the future "accumulation and preservation of ... wealth." Defendants prepared and presented a comprehensive tax and estate planning analysis that made several planning recommendations.
Included among the recommendations was Papetti's proposal that FMC participate in EPIC. The EPIC plan was designed by defendant Ronn Redfearn and marketed through defendant Tri-Core, Inc. (Tri-Core). EPIC was presented as a multi-employer trust, funded by life insurance products purchased by the individual employers from designated insurance companies. Employers joined the trust by executing an adoption agreement. The employer paid annual contributions and deducted the sums as business expenses pursuant to 26 U.S.C.A. § 162.[1]
Prior to retirement, a covered employee received death benefits through group term life insurance; following retirement, the employee could convert the term insurance *946 interest to an individual universal life insurance policy.
EPIC's insurance benefits were provided through a program called Group Entry Age Reserve (GEAR), developed by Tri-Core, which served as the EPIC Plan Administrator. The key feature of GEAR was the conversion option available to employees who terminated participation in the plan. The employer's premium costs for the insurance were based on an employee's age when he or she "began [] employment, not [] retirement age." In this way, the universal life policy costs were lower than costs had the policy issued upon retirement.
The GEAR marketing materials tout the ease with which a participating employer funds the individual universal life insurance policies for its terminating employees, explaining that a portion of an employer's annual contributions are set aside in a rate stabilization reserve, which is used to pay the conversion costs charged when an employee retires. The insurance feature called, "Continuous Group" or "C-Group," is defined in the materials as
a plan of group term life insurance with a special conversion option. When combined with the EPIC Plan and Trust, actuarially determined deposits are fully deductible. Upon retirement, the participants may convert to an individual universal life special conversion policy and take tax free annual distributions.
Although the premium costs on the C-Group product were significantly greater than premiums for a conventional group term life insurance policy, Barrett and Papetti explained that under EPIC, FMC would reap large tax benefits by deducting the annual contributions. FMC would pay the annual tax deductible contributions. Approximately twenty percent of each annual payment covered the premiums for group life insurance for FMC's employees. The remaining eighty percent would accumulate in a reserve "fund" to pay the conversion benefits when the principal-employees[2] retired. Upon retirement, the employee would use the excess contributions to buy "conversion credits" to obtain the individual's universal life policy. In the first year after conversion, the Dameos would pay a post-retirement premium of $5,000 and their converted policy would have a cash value of approximately $255,000; the following year another $5,000 premium would further increase the policy's cash value. Thereafter, the Dameos could borrow against the individual policy, withdrawing the cash value without incurring a tax consequence. "In other words, the benefits would include tax-free deductions to purchase the insurance and a tax-free loan after conversion." Finderne I, supra, 355 N.J.Super. at 183, 809 A.2d 842.
Barrett and Papetti gave the Dameos schedules specifying the annual retirement benefit at age sixty-five. The documents represented that upon conversion at age sixty-five, Rocque and Daniel would receive annual tax free annuity-like payments of $26,532, and $24,541, respectively for twenty-years.
FMC executed the EPIC adoption agreement on January 1, 1991. FMC also set up a trust to act as a vehicle to deliver the program of benefits promised by EPIC to its covered employees. Finderne I, supra, 355 N.J.Super. at 187, 809 A.2d 842. FMC participated in EPIC for six years paying $336,591.86 in contributions.
*947 The EPIC plan was substantively challenged by the IRS. The IRS concluded EPIC was not an employee benefit plan, but a method to defer compensation. Therefore, the employer's claimed business expenses were disallowed and the employees could be taxed on the benefits received.
FMC was audited for the tax years 1994 and 1995. The IRS disallowed the deductions for the EPIC contributions that exceeded the actual cost of the employees' term life insurance benefits. In its settlement with the IRS, FMC remitted approximately $50,000 to pay the taxes deemed due and interest on those payments for the two identified tax years. The IRS agreed to waive applicable penalties and the potential recovery for unpaid taxes in the remaining years of FMC's EPIC participation. Also, FMC agreed to terminate its EPIC participation.
FMC ceased making EPIC contributions in 1996. The last payment covered premiums due up to September 1, 1997. The Dameos attempted to recover the contributions believed to have accrued in EPIC's reserve fund. They learned the reserve was not an actual depository of funds, but a book entry.
In a February 25, 1998 letter, Barrett urged the Dameos to exercise the right to convert the insurance and cautioned that the term insurance coverage would lapse without payment of the outstanding sums due. The overdue premium owed was $72,967.86. Eventually, the Dameos completed the documentation for conversion of the policies. The insurance company denied the requests, stating the policy had lapsed.
Plaintiffs' amended complaint asserted a variety of causes of action, including violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. §§ 1961-1968, and the New Jersey Racketeering Act (NJRICO), N.J.S.A. 2C:41-1 to -41-6.2, as well as claims of fraud, consumer fraud, equitable fraud, negligent misrepresentation, breach of fiduciary duty, conspiracy, and aiding and abetting.[3]
Plaintiffs asserted Barrett and Papetti failed to warn the beneficial tax features of EPIC were not sanctioned by the IRS, and failed to disclose they received commissions based on plaintiffs' EPIC contributions. Additionally, plaintiffs maintained Barrett and Papetti knew EPIC had no reserve fund to pay promised benefits upon the termination of participation because the hefty contributions were used to pay the promoters' commissions. Finally, plaintiffs contend defendants failed to reveal that Commonwealth Life Insurance Company (Commonwealth), the company providing the convertible term policies through EPIC, was not licensed in New Jersey.
Prior to trial, defendants submitted a $350,000 offer of judgment. Plaintiff did not accept and the offer expired. The jury verdict was returned on August 4, 2005. The trial court molded the verdict, and after the addition of pretrial interest, a judgment was entered against Barrett and Papetti each for $36,734.60. Plaintiffs' post-verdict motions for a judgment not withstanding the verdict or for a new trial were denied. Also, defendants' motions for counsel fees because plaintiffs declined to accept the offer of judgment were denied. *948 The appeals and cross-appeals followed.

II
Important to the understanding of plaintiffs' claims is a brief discussion of the federal tax provisions implicated by EPIC. The Deficit Reduction Act of 1984 (Act), Pub. L. 98-369 (1984), amended the Internal Revenue Code (Code) to add sections 419 and 419A. The intended effect of these amendments was to squarely limit the deductibility of an employer's contributions to pre-fund an employee welfare benefit fund. 26 U.S.C.A. § 419 and § 419A. Concerned with the tax shelter potential when employers claimed deductions for expenses that had not yet been incurred, the amended statute espoused the general policy that "contributions paid or accrued by an employer to a welfare benefit fund ... shall not be deductible" by the employer, except as specifically allowed by the statute. 26 U.S.C.A. § 419(a). If a plan qualified, such that the contributions were deductible, then 26 U.S.C.A. § 419(a)(2) and (b) limited the amount and nature of the payments. Generally, deductions were limited to the actual cost of the circumscribed benefits and the maximum aggregate total benefit per employee was capped at $50,000. Ibid.
The related amendments adding 26 U.S.C.A. § 419A(a), allowed employers to establish "qualified asset accounts" consisting of assets set aside to provide for the payment of employee benefits for (1) disability, (2) medical, (3) supplemental compensation or severance pay, or (4) life insurance. The Code section set forth similar rules that limited funding and the permitted deductions for these benefit plans. One provision sanctioned an employer's pre-funding of limited post-retirement benefits using a trust or "reserve" account. 26 U.S.C.A. § 419A(c)(2). To be deductible, contributions to a reserve account must accumulate solely for the payment of qualified post-retirement medical and life insurance benefits in accordance with a stated formula. Ibid. Further, the fund must be nondiscriminatory, i.e., cover all employees, and the maximum aggregate total benefit per employee must not exceed $50,000. 26 U.S.C.A. § 419A(e).
Other Code amendments in the Act imposed an excise tax to discourage abusive use of welfare benefit plans. 26 U.S.C.A. § 4976. The excise tax was assessed on the employer and equaled 100 percent of any "disqualified benefits" provided by the welfare benefit plan. Ibid.
A special kind of multiple employee welfare benefit plan was exempt from the funding restrictions of sections 419 and 419A. A plan that was part of a "10 or more employer plan," 26 U.S.C.A. § 419A(f)(6), was permitted to deduct contributions as business expenses so long as no single employer contributed more than ten percent of the total contributions and the allocated plan contributions did not use experience rating arrangements with respect to the individual employers.[4]Ibid.
In a letter dated January 28, 1992, Barrett advised the plaintiffs EPIC was designed to "comply with each provision of [26 U.S.C.A. 419A(f)(6)]" thus, allowing the employer to deduct unrestricted amounts of contributions often designated for the most highly compensated employees.[5]
*949 The IRS had not proposed regulations explaining its interpretation of these new Code sections. Journal articles were written by tax specialists offering perspectives on whether the newly promoted plans in fact qualified for the favorable tax treatment allowed by section 419A(f)(6). In June 1992, the IRS issued for use by its employees, a 117-page book entitled, "The Tax Treatment of Contributions to Funded Welfare Benefit Plans Under IRC Sections 419 and 419A."
In 1995, the IRS began to challenge certain welfare benefit plans purportedly designed to qualify for the 26 U.S.C.A. § 419A(f)(6) exemption and disallowed favorable tax treatment claimed for the employer's contributions to those plans. On May 18, 1995, the IRS issued Notice 95-34. The Notice explained that the IRS examined "trust arrangements that [promoters] claim satisfy the requirements for the 10-or-more-employer plan exemption and that are used to provide benefits[,] such as life insurance, disability, and severance pay benefits." I.R.S. Notice 95-34, 1995-1 C.B. 309. The IRS announced its disagreement that these plans qualified for preferential tax treatment under 26 U.S.C.A. § 419(f)(6). Ibid.
The Notice stated these "trusts often maintain separate accounting of the assets attributable to the contributions made by each subscribing employer[, and b]enefits are sometimes related to the amounts allocated to the employees of the participant's employer." I.R.S. Notice 95-34, 1995-1 C.B. 309. The Notice further warned that plans of this type, which charged contributions based on the employer's experience in a way that "insulates the employer to a significant extent from the experience of other subscribing employers" will "not satisfy the requirements of the section 419A(f)(6) exemption and do not provide the tax deductions claimed by the promoters...." Ibid.
Thereafter, in Booth, supra, 108 T.C. at 561, the United States Tax Court, examined a benefit plan similar to EPIC, entitled the "Prime Financial Benefits Trust Multiple Employer Welfare Benefit Plan and Trust" (the Prime Plan). The Prime Plan used life insurance to provide severance benefits to the participating employees. Id. at 556. The court upheld the IRS's tax position, which mirrored the warnings contained in Notice 95-34. Id. at 576-77.
In Booth, "the IRS did not interpret the statutory language [of section 419A(f)(6)] to include a program, like the EPIC Plan, `where multiple employers have contributed funds to an independent party to hold in separate accounts until disbursed primarily for the benefit of the contributing employer's employees in accordance with unique terms established by that employer.'" Finderne I, supra, 355 N.J.Super. at 184, 809 A.2d 842 (quoting Booth, supra, 108 T.C. at 571). The Tax Court determined the Prime Plan was "an aggregation of separate welfare benefit plans, each of which has an experience-rating arrangement with the contributing employer," ibid., and one administrator, id. at 571, not a "10 or more employer plan" that lacks "experience-rating arrangements with respect to individual employers" as required by 26 U.S.C.A. § 419A(f)(6). Booth, supra, 108 T.C. at 565.
The Tax Court concluded that for a plan to qualify for exemption under the Code section, "there must be a single pool of funds for use by the group as a whole...." *950 Id. at 571. Although several employers participated in the Prime Plan, each employer's contributions were based on the employer's determined needs and funds were separated to solely benefit the employer's employees. Ibid.
The second significant United States Tax Court decision that reviewed the new section 419A(f)(6) multiple employer welfare benefit plans was Neonatology Assocs., P.A. v. Comm'r, 115 T.C. 43, 2000 WL 1048512 (2000), aff'd, 299 F.3d 221 (3d Cir.2002). The case involved the validity and legitimacy of a Voluntary Employees' Beneficiary Association (VEBA) plan.[6]Id. at 56. The mechanics of the VEBA were similar to EPIC in that the employer overpaid for C-Group policies (group term policies with conversion credits to purchase an individual whole life policy upon termination or retirement). Id. at 53-54. The Tax Court held that the contributions to a VEBA made by two professional medical corporations were disguised taxable dividends and not deductible expenses by the employer. Id. at 97. The court labeled the plan "a tax avoidance scheme" and its purported tax benefits were disallowed. Id. at 100-01. In affirming the Tax Court, the Third Circuit made clear VEBAs were not the type of multiple employer plans allowed by section 419A(f)(6). Neonatology Assocs., P.A. v. Comm'r, 299 F.3d 221, 232 (3d Cir.2002).
At trial, the parties' experts disagreed when Barrett and Papetti knew or should have known EPIC ran afoul of the IRS requirements to qualify for the asserted preferred tax treatment. Floyd Culhane, Jr., Esq., one of plaintiffs' experts published an article in January 1992 titled "Risks Involved in the Sale of Life Insurance to Multiple Employer Welfare Benefit Plans." Culhane acknowledged that when he wrote the article, "there was no guidance from the IRS on [section] 419A(f)(6) [plans]." His article predicted that the "new type of multiple employer welfare benefit plan" marketed to closely held businesses, "under claims that inordinately large current deductions are available for contributions to fund severance pay plans and death benefit plans" did not qualify as exempt section 419A(f)(6) plans. Culhane concluded the mechanisms of these non-qualifying plans "attempt to exploit a loophole in rules regarding income tax deductibility of the contributions" and the plans continued "the abuse Congress sought to curb" by the amendments of the Act. Culhane testified EPIC was "exactly the plan" his article discussed because its structure did not fit the previously accepted structure of multi-employer welfare benefit plans.
After reading Culhane's article early in 1992, prior to the plaintiffs' participation in EPIC, Papetti contacted Culhane to "get his thoughts and understand where he was coming from." Papetti believed the EPIC's conversion provision would not be considered a disallowed post-retirement benefit to employees and Culhane's commentary was directed to "a different type of employee benefit plan," that provided severance benefits.
Russell Greenblatt, Esq., defendants' expert on taxation and employee benefit and welfare plans, specialized in VEBAs. In 1980, he had substantially authored the IRS regulations governing those associations. *951 Greenblatt concurred that in 1991 or 1992 "[t]here was zero guidance" from the IRS on how the new Code sections would be interpreted or what was permitted under section 419A(f)(6). Greenblatt distinguished EPIC from the plans discussed in Booth and Notice 95-34, and he concluded, Barrett and Papetti had no reason to believe EPIC was abusive.
We now examine plaintiffs' arguments as related to their claims of fraud and misrepresentation against defendants.

III
Plaintiffs propose that providers of personal financial planning services are subject to the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -166. Prior to trial, defendants Barrett and Papetti filed motions for summary judgment on the CFA claims, which were denied. On reconsideration, the motion judge[7] reviewed whether the sale of life insurance through EPIC was the type of transaction intended to be covered by the CFA. See Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 265, 696 A.2d 546 (1997) (CFA's language was "ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers"). The motion judge reversed the prior determination and concluded the insurance transactions in this case were factually distinguishable from those presented in Lemelledo, such that the EPIC tax avoidance program was not encompassed by the protections of the CFA. The motion judge also examined the services rendered by Barrett and Papetti, concluding they were exempt because they "involv[ed] the rendering of services by a learned professional." Neveroski v. Blair, 141 N.J.Super. 365, 379, 358 A.2d 473 (App.Div.1976). With respect to the other defendants, the judge concluded that as a matter of policy, "an aggressive tax strategy ... hardly merits the protective cocoon of the CFA." Thus, the court granted summary judgment on this claim.[8]
Plaintiffs focus on the actions of Barrett and Papetti that induced them to participate in EPIC, arguing the motion judge erred as a matter of law. Plaintiffs argue EPIC was "a fancy way to package the sale of the C-Group insurance product" and assert the transaction falls within the scope of the CFA. Defendants center their arguments on the transaction between FMC and EPIC, suggesting the CFA does not apply to participation in such a sophisticated employee benefit plan. Defendants additionally assert they rendered excluded "professional services."
Based on the motion record, granting all inferences to plaintiffs as we must, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), we are satisfied that Barrett and Papetti did not disclose all they knew about the potential tax risks of EPIC participation. They also *952 withheld revelation of the insurance company's control over the amount and issuance of conversion credits, and that their remuneration was paid from FMC's EPIC contributions. In light of these misrepresentations, our review is whether Barrett and Papetti are learned professionals and whether EPIC is the type of transaction encompassed by the CFA.
The CFA proscribes conduct including the:
act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby is declared to be an unlawful practice....
[N.J.S.A. 56:8-2.]
"[T]he legislative concern was over sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices." Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 271, 390 A.2d 566 (1978). "Merchandise" as used in this section is defined to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).
To accomplish the CFA's remedial purposes, its provisions have been interpreted broadly. Lemelledo, supra, 150 N.J. at 264, 696 A.2d 546; Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604, 691 A.2d 350 (1997); Leon v. Rite Aid Corp., 340 N.J.Super. 462, 467-68, 774 A.2d 674 (App.Div.2001). However, "the CFA does not cover every sale in the marketplace" because "CFA applicability hinges on the nature of a transaction, requiring a case by case analysis." Papergraphics Int'l, Inc. v. Correa, 389 N.J.Super. 8, 13, 910 A.2d 625 (App.Div.2006).
When analyzing whether a transaction is covered by the CFA, "it should ordinarily be assumed that the CFA applies to the covered practice." Lemelledo, supra, 150 N.J. at 268, 696 A.2d 546. "The presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation, preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud." Id. at 270, 696 A.2d 546.
Certain transactions that involve services provided by "learned professionals" have been deemed to fall outside the scope of the CFA. See Macedo v. Dello Russo, 178 N.J. 340, 346, 840 A.2d 238 (2004) (physician's advertisement in respect of the rendering of professional services are insulated from the CFA); Neveroski, supra, 141 N.J.Super. at 379, 358 A.2d 473[9] ("Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the [CFA] despite the fact that he renders `services' to the public."); Plemmons v. Blue Chip Ins. Servs., Inc., 387 N.J.Super. 551, 556, 904 A.2d 825 (App.Div.2006) (insurance broker is "a semi-professional, who is subject to testing, licensing and regulation under other statutory provisions, *953 and therefore, is excluded from liability under the CFA for the performance of brokerage services"); Blatterfein v. Larken Assocs., 323 N.J.Super. 167, 175, 782 A.2d 555 (App.Div.1999) (architect providing professional architectural services may not be covered by the CFA); Hampton Hosp. v. Bresan, 288 N.J.Super. 372, 383, 672 A.2d 725 (App.Div.) (services performed by hospital not encompassed by the CFA because hospitals are heavily regulated by the state), certif. denied, 144 N.J. 588, 677 A.2d 760 (1996); Vort v. Hollander, 257 N.J.Super. 56, 62, 607 A.2d 1339 (App.Div.) (professional services rendered by attorneys with regard to their clients' rights as owners of real estate were not covered by CFA), certif. denied, 130 N.J. 599, 617 A.2d 1221 (1992); Stella v. Dean Witter Reynolds, Inc., 241 N.J.Super. 55, 75, 574 A.2d 468 (App.Div.1990) ("fraud in the sale of shares of stock or other securities is not within the compass" of the CFA).
The Supreme Court has recently reinforced the viability of the learned professionals exemption, stating "forty years after the CFA was enacted, our jurisprudence continues to identify learned professionals as beyond the reach of the [CFA] so long as they are operating in their professional capacities." Macedo, supra, 178 N.J. at 345-46, 840 A.2d 238. Nevertheless, services provided by professionals acting outside their professional capacity may be covered by the CFA. See Gilmore v. Berg, 761 F.Supp. 358, 375-76 (D.N.J. 1991) (lawyer and accountant were answerable under CFA for efforts to "sell" real estate); Lemelledo, supra, 150 N.J. at 259-60, 696 A.2d 546 (CFA was applicable to a company providing the sale of insurance in conjunction with lending, i.e., "loan packing," although a highly regulated business); Blatterfein, supra, 323 N.J.Super. at 175, 732 A.2d 555 (false representations by an architect performing marketing services was covered by CFA).
We agree with plaintiff that despite Barrett's licensure as an insurance producer and Papetti's certification as an accountant, the services rendered in this instance, termed "financial planning," extended beyond the finite acts of selling insurance policies or providing accounting services. In fact, at trial, Papetti emphasized he "was never engaged as a CPA by the Dameos, [he] was engaged as a [f]inancial planner" and his company was "in the business of providing fee based financial planning." Barrett, the plaintiffs' longtime insurance agent, also characterized his services as "financial planning services."[10] Defendants reviewed and recommended business structure and strategy, advanced the purchase of products to address estate tax minimization, and made investment recommendations for retirement vehicles. Defendants were selling products and services to plaintiffs purportedly to achieve an overall plan for the corporation and the individuals financial well-being. These acts of "financial planning" went beyond Papetti's profession as an accountant or Barrett's as an insurance agent.
Plaintiffs persuasively argue the lack of state or federal licensure or regulation of "financial planners" subjects Barrett and Papetti to CFA liability. Unlike physicians (Macedo), attorneys (Vort) or real estate brokers (Neveroski), no regulatory body defines uniform education, testing, or standards governing financial planners or the products they promote. See N.J.S.A. *954 45:1-1 to -32 (Professions and Occupations Subject To State Boards Of Registration And Examination). Papetti used the designation of "CFP," which he explained was "certified financial planner." Papetti did not elaborate what entity issued the designation. Matthew Tuttle, offered as defendants' expert in financial planning, had no organization certification and stated, "There are hundreds of organizations offering certifications in my field."
We are convinced that self-proclaimed "professionals" offering financial planning services, like Barrett and Papetti, are not the "learned professionals" identified by the court in Neveroski who are beyond the reach of the CFA. Although competing voluntary associations issue designations to those who seek to be called "financial planners," no governmental board or agency regulates or sets uniform minimum education or training criteria. See Plemmons, supra, 387 N.J.Super. at 564, 904 A.2d 825 (professional or semi-professional suggests person is subject to testing, licensing and comprehensive regulation by relevant regulatory bodies); see also, Quigley v. Esquire Deposition Serv., 400 N.J.Super. 494, 507, 948 A.2d 665 (App.Div.2008) (federal depositions shorthand reporting services are not semi-professional because services are not subject to regulation under the state statute and regulations governing shorthand reporting).
We conclude that the lack of uniform regulation of an occupational group defeats its recognition as "learned professionals," as contemplated in Neveroski. This result does not demean the abilities, education, or professionalism of any occupation. It contemplates that there must be some standards by which all members in the profession are measured. Only in this way can the group fall outside CFA regulation.
Also, we reject defendants' suggestion that because a corporation participated in EPIC, the CFA does not apply. "Characterizing consumers as those who both `use and consume economic goods and services,' protections under the CFA [are] extended to corporate plaintiffs `in a consumer oriented situation.'" Papergraphics, supra, 389 N.J.Super. at 12, 910 A.2d 625 (quoting BOC Group, Inc. v. Lummus Crest, Inc., 251 N.J.Super. 271, 277, 597 A.2d 1109 (Law Div.1990)). It is the character of the transaction, not the identity of the purchaser, which determines whether the CFA is applicable. J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp., 31 F.3d 1259, 1273 (3d Cir.1994). "Unlawful practices thus can victimize business entities as well as individual consumers." Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J.Super. 350, 357, 515 A.2d 246 (App.Div.), certif. denied, 107 N.J. 60, 526 A.2d 146 (1986).
Although we agree the learned professional exception is inapplicable, and FMC's participation does not proscribe CFA application, we must also examine whether plaintiffs' investment in a product like EPIC is subject to the protections of the CFA.
To qualify as a consumer transaction, which is not defined in the CFA, the challenged services generally must be of the type sold to the general public. See, e.g., S. Broward Hosp. Dist. v. MedQuist, Inc., 516 F.Supp.2d 370, 399 (D.N.J.2007), aff'd, 258 Fed.Appx. 466 (3d Cir.2007); Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F.Supp.2d 557, 561 (D.N.J.2002); Marascio v. Campanella, 298 N.J.Super. 491, 499, 689 A.2d 852 (App.Div.1997); BOC Group, supra, 251 N.J.Super. at 278, 597 A.2d 1109. "Furthermore, `[t]he entire thrust of the Act is pointed to products and services sold to consumers in the popular sense.'" Cetel v. Kirwan Fin. Group, Inc., 460 F.3d 494, *955 514 (3d Cir.2006) (quoting Arc Networks, Inc. v. Gold Phone Card Co., 333 N.J.Super. 587, 589, 756 A.2d 636 (Law Div.2000) (internal quotations omitted), cert. denied, ___ U.S. ___, 127 S.Ct. 1267, 167 L.Ed.2d 78 (2007)).
In Cetel, supra, the Third Circuit examined the physician plaintiffs' and their professional corporations' claims that the defendants misrepresented the tax benefits offered by investment in a VEBA. 460 F.3d at 500. The VEBA plans were similar to EPIC in that the employers purchased "C-Group" convertible term life insurance policies for employees at an inflated cost. Id. at 501. The employers' annual contributions were to be tax-deductible and the employees could later convert the group life insurance to individual policies, using the premium overpayments as tax conversion credits. Ibid.
Agreeing with the trial court, the Third Circuit concluded that "the VEBA plans were complex tax-avoidance schemes designed primarily to allow an investor to make tax-deductible contributions while allowing for a permanent tax deferral upon withdrawal." Id. at 514. The court affirmed the trial court's dismissal of the plaintiffs' CFA claims, concluding the "rather complex arrangements" required by participation in the VEBA plans did not "reflect the kinds of goods or services generally sold to the public." Id. at 514 (quotations and citations omitted). Moreover, the court determined the plans were "marketed to a discrete and specific class of capable investors  not the general public," and concluded "the sale of complex employee welfare benefit plans to a very specific class of investor does not point to the remedial purpose or intent of the CFA." Ibid.
This reasoning directly applies to the facts at hand. EPIC was not a single transaction, such as obtaining a loan or buying an insurance policy. It was very complex. The sixty-page disclosure document detailed the intricacies of EPIC's multiemployer trust and the trust's ownership of the insurance polices purchased; the role of the EPIC plan trustee; the need for the simultaneous establishment by each individual of a trust to receive any insurance proceeds; the purchase of term insurance policies and the workings of the conversion credits to obtain universal whole life insurance; and the existence of stabilization reserve accounts and accumulations of excess contributions for the future conversion purposes of the individual insureds. The layers of the EPIC plan implicated numerous Code sections striving to achieve the "too good to be true" tax benefits that foreshadowed an IRS challenge as a tax avoidance design.
Furthermore, we do not view plaintiffs as unsophisticated buyers, victimized after being lured into EPIC through fraudulent, deceptive selling or advertising practices. Plaintiffs sought advice from both an accountant and an attorney while proceeding with their estate plan, which included executing the EPIC adoption agreement. The EPIC documents were replete with recommendations and disclaimers to seek independent guidance. For example, this disclaimer was included in defendants' initial planning proposal:
THIS IS A PROPOSAL NOT A CONTRACT. TAX AND LEGAL CONSEQUENCES AND COMPLIANCE WITH ERISA ARE THE SOLE RESPONSIBILITY OF THE EMPLOYER AND ITS ATTORNEYS.
This directive was in the financial illustrations:
ALL QUESTIONS OF TAX AND LEGAL NATURE SHOULD BE REFERRED TO TAX COUNSEL.
This language was in the EPIC Adoption Agreement:

*956 [T]ri-Core, Inc. and Trustee have recommended that such employers seek independent tax advice regarding the tax consequences of Employer's participation in the Trust prior to executing this Adoption Agreement.
And, this statement was placed above the signature line of the Adoption Agreement:
The undersigned hereby represents that (1) ... (2) legal and tax counsel have been consulted to the extent the undersigned deems necessary and appropriate; (3) neither the insurer nor its agents can guarantee or promise that any anticipated favorable tax results will in fact be achieved....
Perhaps these statements alone would be considered "boilerplate" and not be determinative of the complexity or risk of the endeavor; however, when they are set in the context of plaintiffs' desire to obtain large corporate deductions and substantial tax free income for themselves, it is clear this was a device to shelter income from taxation, which is not a consumer transaction as envisioned by the adopters of the CFA.
The courts have recognized the "need to place reasonable limits upon the operation of the [CFA] `despite broad statutory language[,] so that its enforcement properly reflects legislative intent....'" DiBernardo v. Mosley, 206 N.J.Super. 371, 375, 502 A.2d 1166 (App.Div.), (quoting Jones v. Sportelli, 166 N.J.Super. 383, 388, 399 A.2d 1047 (Law Div.1979)), certif. denied, 103 N.J. 503, 511 A.2d 673 (1986). Accordingly, we conclude the denial of the broad remedial relief of the CFA to plaintiffs' participation in the disallowed EPIC tax avoidance program does not thwart the Legislature's desire to protect consumers.

IV
Next, plaintiffs contend the motion judge erred in excluding their claims for damages based on their expectation under EPIC, i.e., damages equivalent to the retirement benefits promised. Defendants counter any claim for benefit-of-the-bargain damages was speculative and inappropriate because plaintiffs failed to exercise the available conversion option to realize this benefit.
In denying recovery for "benefit-of-the-bargain" damages, rather than "out-of-pocket" losses incurred as a result of the collapse of the EPIC plan, Judge Derman identified the high stakes tax avoidance plan and the speculative rewards contemplated by a taxpayer joining EPIC. She concluded:
If this court were to allow [p]laintiffs to pursue damages under the benefit of the bargain theory, the court would in essence be allowing [p]laintiffs to realize benefits that the federal government has already determined are not allowed under our tax laws.
....
Also, Zeliff v. Sabatino, [15 N.J. 70, 104 A.2d 54 (1954)], holds that the formula utilized, benefit of the bargain or out of pocket, must be the one that is "appropriate under the circumstances." The court finds it unreasonable and incredible that [p]laintiffs thought that, because of the exploitation of a tax loophole,... they were guaranteed by defendants to receive post-retirement income, tax-free for twenty years.... [Benefit-of-the-bargain damages] would be a windfall, and ... it would be condoning a manipulation of the [Code]. This court will not be a party to device in which essentially, as the Tax Court described in Neonatology, [supra,] 115 T.C. [at 89], the plan was a vehicle "designed... to distribute surplus cash surreptitiously (in the form of excess contributions) from the corporations for *957 the employer/owners' ultimate use and benefit," tax free.
Although we do not owe any special deference to a trial court's legal conclusion, Shaler v. Toms River Obstetrics & Gynecology Assocs., 383 N.J.Super. 650, 657, 893 A.2d 53 (App.Div.), certif. denied, 187 N.J. 82, 899 A.2d 304 (2006), we are in agreement with the above analysis.
The appropriate measure of damages in fraud cases has been recognized as a "perplexing problem." Correa v. Maggiore, 196 N.J.Super. 273, 284, 482 A.2d 192 (App.Div.1984). The typical dispute is between applying an "out-of-pocket" model, versus the "benefit-of-the-bargain" rule. Ibid. Out-of-pocket damages represent the difference between the price paid and the actual value received. Ibid. On the other hand, benefit-of-the-bargain principles allow "recovery for the difference between the price paid and the value of the property had the representations been true." Ibid. "[S]o long as the amount of the lost benefit can be established by the proofs with sufficient certainty, a court will award damages equal to that which a plaintiff would have received had the representation been true." McConkey v. AON Corp., 354 N.J.Super. 25, 52, 804 A.2d 572 (App.Div.2002), certif. denied, 175 N.J. 429, 815 A.2d 476 (2003).
New Jersey recognizes benefit-of-the-bargain damages in fraud cases. Lipsit v. Leonard, 64 N.J. 276, 285 n. 4, 315 A.2d 25 (1974); Zeliff, supra, 15 N.J. at 74, 104 A.2d 54; Correa, supra, 196 N.J.Super. at 285-86, 482 A.2d 192. However, the requirement of establishing the amount claimed with "sufficient certainty" is essential. Gardner v. Rosecliff Realty Co., 41 N.J.Super. 1, 11, 124 A.2d 30 (App. Div.1956).
The ultimate benefits available to plaintiffs had EPIC been allowed by the IRS were uncertain. The projected retirement benefits analysis given to plaintiffs were estimates, contingent on issues including the amount of the conversion credits as allowed by the insurance company, FMC's experience rating, or possible future changes in the tax laws. Plaintiffs knew their EPIC participation involved taking advantage of the narrow exclusion provided by 26 U.S.C.A. § 419A(f)(6). They also knew they were significantly overpaying for group term life insurance and claiming the inflated amount as a business expense.
Even more critical to defeat plaintiffs' argument that it should recover benefit-of-the-bargain damages is the fact that this court would be required to enforce the EPIC plan provisions, which were disallowed by the IRS.
[I]n no way and through no channels, directly or indirectly, will the courts allow an action to be maintained for the recovery of property delivered under an illegal contract where, in order to maintain such recovery, it is necessary to have recourse to that contract. The right of recovery must rest upon a disaffirmance of the contract, and it is permitted only because of the desire of courts to do justice as far as possible to the party who has made payment or delivered property under a void agreement, and which in justice he ought to recover. But courts will not in such endeavor permit any recovery which will weaken the rule founded upon the principles of public policy already noticed. [Pullman's Palace Car Co. v. Central Transp. Co., 171 U.S. 138, 151-52, 18 S.Ct. 808, 814, 43 L.Ed. 108, 114 (1898).]
Longstanding public policy, that is, "ex dolo malo non oritur actio," which means "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act," prohibit plaintiffs' requested *958 recovery. Ibid. (quoting Holman v. Johnson, 1 Cowper 341 (1775)). We will not effectively enforce the terms of the EPIC plan found to flaunt the tax laws. Although it is axiomatic that taxpayers lawfully may arrange their affairs to keep taxes as low as possible, nevertheless, "[w]hen, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril.... [I]t was not likely that by complex manipulation [plaintiffs] could obtain large deductions for their corporations and tax free income for themselves." Neonatology, supra, 299 F.3d at 234; see also Saviano v. Comm'r, 765 F.2d 643, 654 (7th Cir.1985) ("The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service will play along.").

* * * *
[At the direction of the court, per Rule 1:36-2(a), Part V of the opinion is omitted from publication.]

* * * *

VI
We turn to the jury instruction errors alleged by plaintiffs. Plaintiffs advance the following errors in the charge: (1) on the RICO claims,[11] inclusion of the ultimate outcome charge; (2) improperly articulating the fiduciary responsibilities of defendants; (3) failure to charge plaintiffs could not be contributorily negligent; (4) inclusion of a charge that damages could be reduced by any benefits plaintiffs received by EPIC participation; (5) charging mitigation; and (6) inclusion of comparative fault. Prior to consideration of these arguments, we recite the principles that guide our review.
"A jury is entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case." Viscik v. Fowler Equip. Co., 173 N.J. 1, 18, 800 A.2d 826 (2002) (citing Rendine v. Pantzer, 276 N.J.Super. 398, 431, 648 A.2d 223 (App. Div.1994)); Toto v. Sheriff's Officer Rolando Ensuar, 196 N.J. 134, 144, 952 A.2d 463 (2008). The charge to the jury "must correctly state the applicable law, outline the jury's function and be clear in how the jury should apply the legal principles charged to the facts of the case at hand." Ibid.
Erroneous jury instructions constitute reversible error only if the jury could have come to a different result had it been correctly instructed. Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688, 751 A.2d 102 (2000). Erroneous instructions on a material part of the charge are also presumed to be reversible. McClelland v. Tucker, 273 N.J.Super. 410, 417, 642 A.2d 409 (App.Div.1994). One ground for finding an instruction erroneous and likely to mislead the jury is the absence of support for it in the evidence. Dynasty, Inc. v. Princeton Ins. Co., 165 N.J. 1, 13-14, 754 A.2d 1137 (2000); Lesniak v. County of Bergen, 117 N.J. 12, 20, 563 A.2d 795 (1989); Guzzi v. Jersey Cent. Power & Light, 12 N.J. 251, 260, 96 A.2d 387 (1953), certif. denied, 19 N.J. 339, 117 A.2d 52 (1955). Thus, we undertake our examination by reviewing the charge as a whole, rather than focusing on individual errors in isolation. Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 137 (3d Cir.1997), cert. denied, 522 U.S. 1116, 118 S.Ct. 1052, 140 L.Ed.2d 115 (1998); Mohr v. B.F. Goodrich Rubber Co., 147 N.J.Super. *959 279, 283, 371 A.2d 288 (App.Div.), certif. denied, 74 N.J. 281, 377 A.2d 685 (1977).
We agree with plaintiffs' argument that federal law applies with respect to the RICO charge, and informing the jury of the ultimate outcome of a verdict on the RICO count was inappropriate. St. James v. Future Fin., 342 N.J.Super. 310, 348, 776 A.2d 849 (App.Div.), certif. denied, 170 N.J. 388, 788 A.2d 773 (2001). The judge advised if defendants were liable under RICO, the damages are trebled and attorney's fees awarded. 18 U.S.C.A. § 1964(c). Those federal courts addressing the issue have consistently held that the implementation of treble damages is a function for the court, not the jury. HBE Leasing Corp. v. Frank, 22 F.3d 41, 45 (2d Cir.1994). This avoids presenting the jury with information irrelevant to its deliberations that could tempt jurors to manipulate the outcome and lead to intellectually dishonest results. Ibid. In this matter, we conclude the error is of no moment. See R. 2:10-2.
Following the court's instructions, the jury agreed plaintiffs proved defendants formed an informal association to promote EPIC, but determined Barrett and Papetti had not committed the predicate acts of mail or wire fraud. 18 U.S.C.A. § 1961. Nothing suggests the jury was misled or sympathetic to defendants. It is "our belief that jurors are persons of good faith, that they strive to fulfill their role without passion or prejudice toward either side, and that they work hard to abide by all instructions to the best of their ability." Wanetick v. Gateway Mitsubishi, 163 N.J. 484, 494, 750 A.2d 79 (2000). Accordingly, we conclude the verdict was the product of thoughtful deliberations by a diligent jury that viewed the evidence and applied the law as instructed. We are not convinced the use of the inappropriate ultimate outcome charge resulted in manifest injustice or warrants reversal.
On the next challenge, we find unavailing plaintiffs' assertions that the charge was flawed because it inadequately described the nature of the fiduciary obligations owed by Barrett and Papetti, and also failed to include a pronouncement that plaintiffs could not have contributed to their harm.
As requested, the court charged the jury that "as a matter of law, [Barrett and Papetti] both had fiduciary duties with respect to the plaintiffs in this case." Then, the court satisfactorily described the scope and nature of the "duty of loyalty to plaintiffs" and "the duty to exercise reasonable skill and care in giving advice and making recommendations about the [plaintiffs'] participation in the EPIC plan." The additional language plaintiffs requested sought to heighten the loyalty standard. We do not agree that the language was necessary or proper. Moreover, plaintiffs prevailed on their breach of duty claims, militating against claims of error.
Next, plaintiffs target the portion of the jury instruction related to damages, presumably due to dissatisfaction with the amount of the award. Plaintiffs argued for an instruction telling the jury to ignore possible tax savings. Defendants maintained the tax deductions taken by FMC in four of the six years of EPIC participation were a permissible offset against damages. The trial judge determined he could not state as a matter of law that there was or was not a benefit. He included both positions in the charge and left the question of whether there was a realized benefit for the jury. Thus, the jury could consider whether plaintiffs were entitled "to get all [their] money back."
*960 Plaintiffs rely on Randall v. Loftsgaarden, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), suggesting "as a matter of law" plaintiffs' "tax deductions should not be taken into account in determining damages in business transactions." We disagree that the United States Supreme Court made such a pronouncement. In fact, the Court actually demurred on "whether evidence concerning tax benefits is ordinarily so speculative as to be beyond the jury's province." Id. at 664-65, 106 S.Ct. at 3153-54, 92 L.Ed.2d at 544.
In Randall, supra, the plaintiff purchased a limited real estate partnership interest in a motel. 478 U.S. at 650, 106 S.Ct. at 3146, 92 L.Ed.2d at 533. The plaintiff's rescission action, brought under § 12(2) of the Securities Act of 1933 (Act), [15 U.S.C.A. § 77l(2)], sought return of her investment based on fraud in the prospectus.[12]Ibid. At issue was the calculation of rescissory damages as allowed under the Act. Ibid. The statute provides a defrauded investor harmed by a prospectus fraud may sue "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon...." 15 U.S.C.A. § 77l(2).
Examining this language, the Supreme Court concluded the tax benefits from the investment were not "income received" and were not to be offset from the recovery. Randall, supra, 478 U.S. at 656, 106 S.Ct. at 3149, 92 L.Ed.2d at 537. The discussion specifically centered on Congress's intent. The Court concluded by enacting the specific statutory remedy of rescission, Congress intended to provide what may be an enhanced recovery. Id. at 664, 106 S.Ct. at 3153, 92 L.Ed.2d at 542. "[R]escission adds an additional measure of deterrence as compared to a purely compensatory measure of damages." Id. at 659, 106 S.Ct. at 3151, 92 L.Ed.2d at 539.
We cannot construe Randall's holding as dispositive in this matter. The fraud alleged by the plaintiff in Randall was a prospectus misrepresentation directed to the value of the underlying asset, not a misrepresentation as to the level of potential tax benefits from the investment. Had the basis of the plaintiff's suit been a misrepresentation of the level of tax benefits, the Supreme Court stated "we do not consider whether courts may ever refuse to allow a rescissory recovery under [the statute] where the `premium' for expected tax benefits represented a large portion of the purchase price, in which event the out-of-pocket measure might yield a significantly smaller recovery." Id. at 667, 106 S.Ct. at 3155, 92 L.Ed.2d at 544.
The case at bar was not one seeking rescission, but actual damages. Judge Ashrafi adopted the rationale of the Seventh Circuit in Burdett v. Miller, 957 F.2d 1375, 1383 (7th Cir.1992). In Burdett, supra, the court noted the plaintiff's investment was intended to generate tax benefits, which included losses incurred by the purchase of the tax shelter, designed to offset other income, thus, reducing the taxpayer's overall tax obligation. 957 F.2d at 1384. The court concluded the tax benefits must be considered when fixing actual damages as "[t]he essential point is that with regard to benefits of whatever sort that are promised and received, there is no injury, [and] no basis for a claim of damages." Ibid.
Despite the lack of published authority on this narrow issue, we note New Jersey has a strong public policy against permitting double recoveries. See N.J.S.A. 2A:15-97 (collateral source statute *961 permits the court to deduct any duplicative award from a plaintiff's personal injury recovery); Taylor v. Metzger, 152 N.J. 490, 509, 706 A.2d 685 (1998) (plaintiff cannot obtain double recovery for intentional infliction of emotional distress and violation of LAD); Millison v. E.I. Du Pont de Nemours & Co., 101 N.J. 161, 187, 501 A.2d 505 (1985) (injured employee must reimburse workers' compensation carrier in the event of recovery in civil action for employers' intentional actions that caused injury); Rosales v. State Dept. of the Judiciary, 373 N.J.Super. 29, 31, 860 A.2d 929 (App.Div.2004) (long standing public policy prohibiting dual recoveries for the same disability), certif. denied, 182 N.J. 630, 868 A.2d 1033 (2005); Kislak Co. v. Hirschfeld, 222 N.J.Super. 553, 559, 537 A.2d 748 (App.Div.1988) (real estate agent is entitled to the commission for performance, diminished by any expense to accomplish result, which included commission of selling agent).
We cannot ignore that
a harmed plaintiff is permitted to recover for the wrongdoing of a tortfeasor, but that the plaintiff's recovery should be reduced by any benefits received from the wrongdoers' actions. This is the only reasonable interpretation that furthers the overriding tort damages principle of restoring the plaintiff to the position he or she would have been but for the actions of the tortfeasor.
[Ronson v. Talesnick, 33 F.Supp.2d 347, 354 (D.N.J.1999).]
Here, the trial judge did not instruct the jury to offset the tax savings realized by FMC. He raised the arguments of the parties and allowed the jury to weigh the evidence and consider whether benefits flowed to plaintiffs that lessened their loss. No legal error is presented.

* * * *
[At the direction of the court, per Rule 1:36-2(a), Part VII-VIII of the opinion is omitted from publication.]

* * * *

IX
In their respective cross-appeals, defendants seek entitlement to counsel fees under the offer of judgment rule. R. 4:58-2(a). In June 2004, seven defendants, including Barrett and Papetti, submitted a joint offer of judgment to plaintiffs for $350,000. When plaintiffs did not accept the offer within ninety days, several defendants submitted individual settlement offers. Defendants made no subsequent offers. Barrett and Papetti suggest their liability, pursuant to the verdict when compared to the joint offer, warrants an award of fees and costs. Reviewing these facts, the trial court concluded the rule was inapplicable. We agree.
Under Rule 4:58-1(a), a party may offer to satisfy a claim for monetary relief prior to trial. The rule is "designed to promote early settlement" and discourage rejection of reasonable settlement offers. Palmer v. Kovacs, 385 N.J.Super. 419, 425, 897 A.2d 429 (App.Div.), certif. denied, 188 N.J. 356, 907 A.2d 1015 (2006). If an offer is not accepted under prescribed time limits, it is deemed withdrawn, and "evidence thereof shall not be admissible except in a proceeding after trial to fix costs, interest, and attorney's fee." R. 4:58-1(b). Also, "[t]he making of a further offer shall constitute a withdrawal of all previous offers made by that party." R. 4:58-1(b).
If the offer is not accepted and the party obtains a "favorable determination," the offering party receives costs, reasonable litigation expenses incurred after non-acceptance, prejudgment interest, and reasonable *962 counsel fees occasioned by the non-acceptance. R. 4:58-3(a) referencing R. 4:58-2. A "favorable determination" is a "money judgment . . . excluding allowable prejudgment interest and counsel fees, that is 80% of the offer or less."[13]R. 4:58-3(b).
A basic reading of the Rule's requirements defeats defendants' argument. Plaintiffs had the right to reject the original combined offer by a group of defendants and accept the separately made subsequent offers by certain defendants. Schettino v. Roizman Dev., Inc., 158 N.J. 476, 483, 730 A.2d 797 (1999). By operation of the Rule, the original joint offer was considered withdrawn. Defendants did not offer a subsequent settlement sum to trigger the Rule's application.
We recognize this simplistic approach ignores the difficulties presented when attempting to apply the Rule in complex, multi-defendant cases. Cripps v. DiGregorio, 361 N.J.Super. 190, 198, 824 A.2d 1104 (App.Div.2003). In Cripps, supra, we noted the Rule does not apply to any offer by fewer than all defendants in a "multi-defendant, multi-count case[,] including claims of joint and several liability." 361 N.J.Super. at 198, 824 A.2d 1104. This case illustrates the complexities. Defendants seek credit for the entire amount of the initial offer, yet there is no mention of the actual amount they were to contribute. Plaintiffs respond that their combined recovery from other defendants exceeded the initial settlement offer. The Rule is simply unworkable in this instance.

* * * *
[At the direction of the court, per Rule 1:36-2(a), the balance of the opinion is omitted from publication.]

* * * *
Affirmed.
NOTES
[1] 26 U.S.C.A. § 162(a) permits a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Any item claimed as deductible must be (1) paid or incurred during the taxable year; (2) for carrying on a trade or business; (3) an expense; (4) a necessary expense; and (5) an ordinary expense. Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519, 526 (1971).
[2] The only employees of FMC were the Dameos and their sister, Virginia Kraeutler. Kraeutler was provided group term insurance coverage, however, the conversion feature was applicable only to the Dameos.
[3] Before commencement of the trial, plaintiffs stayed their claim against Tri-Core, which had filed bankruptcy; dismissed the claims against Redfearn, who had passed away; settled their claims against Commonwealth, Lincoln National Life Insurance Company, Cigna's successor, and Steven G. Shapiro, EPIC's counsel. On summary judgment, the court dismissed the claims against defendants CJA Associates and Raymond Ankner.
[4] "The essence of experience rating is the charging back of employee claims to the employer's account" and reducing benefits accordingly. Booth v. Comm'r, 108 T.C. 524, 575, 1997 WL 328581 (1997).
[5] Generally, restrictions included in the Code and the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. § 1001, restrict favorable tax treatment to those employer funded welfare or retirement benefits provided to all employees, not simply those highly compensated individuals who own or run the company. Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 12, 124 S.Ct. 1330, 1339, 158 L.Ed.2d 40, 54 (2004).
[6] The taxation of VEBAs is governed by 26 U.S.C.A. § 501(c)(9). If a VEBA "provid[es] for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, [and] if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual," it is a tax-exempt organization. Ibid. The experts suggested a VEBA could be structured to also qualify under section 419A(f)(6).
[7] The motion judge was not the trial judge.
[8] Plaintiffs sought reconsideration of that order and for recusal of the motion judge. Recusal was granted and the trial judge reviewed plaintiffs' motion request. When ruling on plaintiffs' motion to reconsider the rulings of the August 30, 2004 motion, the trial judge in his oral decision stated "plaintiff is [sic] no longer pursuing that count, and nothing in the motion that's currently before me seeks to have that portion of the order vacated and the consumer fraud count reinstated." However, the April 1, 2005 order entered following the motion, does not mention this ruling. Our review of plaintiffs' brief filed in support of the motion, leads us to conclude plaintiffs did not seek reconsideration of the dismissal of the CFA claims. Thus, the challenge to that decision was not waived, as was suggested by the trial judge. It may be raised on appeal. See Nieder v. Royal Indemn. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
[9] Neveroski was abrogated on other grounds by the 1976 statutory amendment adding "the sale or advertisement of ... real estate" to the provisions of N.J.S.A. 56:8-2.
[10] During the trial, Barrett's counsel at times argued he was "just an insurance salesman," not a fiduciary. We have no need to examine this argument based on Barrett's testimony relating his expanded role to provide other services, not merely to sell life insurance.
[11] During the charge conference, plaintiffs withdrew their NJRICO claims.
[12] The Court additionally reviewed and agreed the plaintiff had an action for rescission under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b).
[13] Subsequent to trial, the rule was amended to change the time limits and the stated percentages. These amendments do not bear on this determination.