**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1077-17T2

RDM CONCRETE
& MASONRY, LLC,

     Plaintiff-Respondent,

v.

SURFSIDE CASUAL FURNITURE,
ROBERT A. HIMMELSTEIN and
STEPHANIE L. HIMMELSTEIN,

     Defendants-Appellants.

_____

SURFSIDE CASUAL FURNITURE,

     Third-Party Plaintiff,

v.

MARK CIULLO and RYAN CIULLO,

     Third-Party Defendants-
     Respondents.

_____

RDM CONCRETE & MASONRY, LLC,

     Fourth-Party Plaintiff,

v.

SL MACINTYRE UNDERGROUND,
LLC,

     Fourth-Party Defendant.

_____

SL MACINTYRE UNDERGROUND,
LLC,

     Fifth-Party Plaintiff,

v.

SURFSIDE CASUAL FURNITURE,
ROBERT A. HIMMELSTEIN and
STEPHANIE L. HIMMELSTEIN,

     Fifth-Party Defendant.

_____

> Argued February 24, 2020 – Decided August 4, 2020
>
> Before Judges Ostrer and Vernoia.
>
> On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2182-13.
>
> William D. Wright argued the cause for appellants (The Wright Law Firm; attorneys; William D. Wright and David T. Wright, on the briefs).
>
> Paul John Endler, Jr. and Edward Francis Bezdecki argued the cause for respondent RDM Concrete & Masonry, LLC (Methfessel & Werbel, attorneys; Paul John Endler, Jr. and Steven Andrew Unterburger, on the brief).

2

PER CURIAM

Defendant-counterclaimant Surfside Casual Furniture (defendant) appeals from a final judgment following a jury trial finding it breached a contract by failing to pay sums due for concrete work plaintiff RDM Concrete & Masonry, LLC (plaintiff) performed during the construction of defendant's Manahawkin furniture store. Defendant claims the court erred by dismissing its Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to 56:8-224, claims against plaintiff and its owner, defendant Mark Ciullo, and employee, Ryan Ciullo; by incorrectly admitting into evidence a letter defendant claims constituted inadmissible hearsay; and by dismissing a portion of defendant's damage claim by applying the economic waste doctrine. Having reviewed the record and arguments of the parties in light of the applicable law, we affirm.

I.

We summarize the facts to provide context for the specific issues raised on appeal.

Defendant has been in the retail furniture business for many years. This appeal arises out of the construction of defendant's Manahawkin furniture store. Robert Himmelstein is defendant's president, and he acted as the general contractor for the store's construction. As the general contractor, he hired the

3

professionals and contractors for the work required for the building's construction, from obtaining the necessary municipal approvals through the excavation of the land and the completion of the site work after the building was fully constructed and ready for occupancy. He testified that, as the general contractor, he "directed [the contractors as to] what to do on . . . their job[s]."

As designed, the store consists of a prefabricated metal building that sits on a 175-foot by 100-foot concrete slab. The building has an open floor plan with a second-floor concrete mezzanine deck, which abuts three sides of the building in the shape of a "U," that is open to the first floor.

Plaintiff is a concrete contractor. Mark Ciullo is plaintiff's president and his son, Ryan Ciullo, is an employee. In 2012, Himmelstein sought referrals for concrete contractors and was referred to plaintiff. Himmelstein met with three or four other concrete contractors, but in September 2012, he selected plaintiff as the project's concrete contractor.

Himmelstein also hired other contractors and professionals in connection with the construction of the building. He employed an architect, a civil engineer, a steel contractor, Stephlynn Ironworks, LLC (Stephlynn), and many other contractors. During his testimony at trial, Himmelstein denied he directly employed a structural engineer for the project, but he relied on the work of

Nelson Structural Engineering, which did business by the tradename Nel-Struct, during the project. Dennis S. Nelson (Nelson) is an employee of Nel-Struct. Himmelstein also employed Craig Testing to test "the concrete and inspect[] the job" for plaintiff.

In September 2012, plaintiff provided defendant with a proposal for the concrete work on the project. Himmelstein testified he had "a lot" of conversations with Ryan Ciullo prior to the proposal, and it can be reasonably inferred the proposal was the product of many discussions between Himmelstein and plaintiff because the proposal identifies ten separate tasks plaintiff offered to perform. The proposal also references Nel-Struct's plans for the building that Himmelstein testified were supplied to him by Stephlynn. The plans did not include wire mesh reinforcement for the mezzanine concrete, but, according to Himmelstein, Ryan Ciullo suggested the inclusion of wire mesh during their pre-proposal discussions. The proposal included wire mesh in the mezzanine concrete.

Himmelstein accepted plaintiff's proposal, but Nel-Struct's final plans were not provided until November 2012. Himmelstein testified about the goods and services plaintiff was required to provide and perform under the proposal. Plaintiff was responsible for laying out the building from established points to

5

ensure it was located where it was "supposed to be." Plaintiff was also retained to perform the "[f]ooting, pier and elevator pit excavation," "[s]upply and install steel reinforcement in footings, pier footings, and elevator pit," pour concrete for the building's elevator, form the walls, and place and finish the concrete for the elevator pit foundation.

Plaintiff was also responsible for digging out the area where the building slab was to be placed and making a "monolithic pour" of concrete for the footings and a 175 foot by 100 foot slab "at the same time." According to Himmelstein, plaintiff was also required to construct a concrete block elevator shaft, pour concrete for the mezzanine slab, and install concrete stair pans.

In January 2013, plaintiff completed what is described as a "monolithic" two-day pour of over 700 cubic feet of concrete for the building's footings and slab. Himmelstein was present for the pour, as was Craig Testing, an inspection service Himmelstein employed to "test[] . . . the concrete and inspect[] the job for" plaintiff. Prior to the pour, Himmelstein agreed to an increase in the price for the concrete because a chemical additive was necessary due to the winter conditions. Himmelstein approved the price increase after receiving correspondence from Stephlynn indicating that Nelson from Nel-Struct indicated the change in the concrete mix was acceptable.

A-1077-17T2

Himmelstein later approved a change order for the addition of fiber mesh to the concrete that was poured in May 2013 for the mezzanine. He testified he agreed to the price increase because he understood the fiber mesh was being added to the wire mesh for the mezzanine specified in plaintiff's original proposal. Ryan Ciullo testified the Nel-Struct plans did not include wire mesh, fiber mesh, or any other reinforcement for the mezzanine contract, and he asked Himmelstein to obtain direction from the engineer, Nel-Struct, as to what reinforcement was required. He also testified he was later provided an April 7, 2013 letter from Nelson that was addressed to Stephlynn stating that either wire mesh or fiber mesh could be used for reinforcement. Ciullo explained that plaintiff submitted a change order for the addition of fiber mesh at an increased price because fiber mesh is more expensive than the wire mesh included in the original proposal. Himmelstein approved the change order, but, as noted, he testified he understood the fiber mesh was being added to the wire mesh plaintiff included in the proposal.

Plaintiff poured the mezzanine concrete in May 2013. Himmelstein and Craig Testing were present, but Himmelstein testified he could not gain access to the mezzanine level. Neither he nor Craig Testing made any claim on the day of the pour that plaintiff failed to include wire mesh.

7

Subsequent to the mezzanine pour, plaintiff sought payment from defendant for sums it claimed remained due and owing. Defendant did not respond to the demand for payment, and plaintiff filed a construction lien claim dated June 7, 2013.

Plaintiff subsequently initiated this action to enforce the construction lien and assert various contractual claims. The complaint alleged defendant, Himmelstein, and Himmelstein's wife were indebted to plaintiff in the amount of $35,576.94. Defendant, Himmelstein, and Himmelstein's wife filed an answer and counterclaim, as well as a third-party complaint against Mark Ciullo and Ryan Ciullo for breach of contract and violation of the CFA. Plaintiff filed a fourth-party complaint against defendant's site work contractor, SL MacIntyre, which filed a fifth-party complaint against defendant, Himmelstein, and Himmelstein's wife.

Prior to trial, the parties agreed defendant would first present witnesses– Himmelstein and civil engineer Robert Romano—that it contended would prove defendant's CFA claim against plaintiff, Mark Ciullo, and Ryan Ciullo. Following Himmelstein's and Romano's testimony, plaintiff, Mark Ciullo, and Ryan Ciullo moved for an involuntary dismissal of the CFA claim, but the court did not decide the motion.

Defendant then presented Edward Ryan, an engineering expert; Robert Delaney, who formally worked for MacIntyre; and Douglas Sell, a certified fraud examiner, as witnesses. Defendant rested its case, and plaintiff presented Ryan Ciullo, engineering expert Joseph Danatzko, and Mark Ciullo.

The court then heard further argument on plaintiff's, Mark Ciullo's, and Ryan Ciullo's motions for an involuntary dismissal and for a directed verdict on the CFA claim. The court granted the motions, finding the transaction did not involve the sale of merchandise covered by the CFA; defendant failed to present evidence establishing it suffered ascertainable damages; and there was no evidence either Mark Ciullo or Ryan Ciullo engaged in unconscionable business practices. Following the granting of plaintiff's motion, MacIntyre presented two witnesses, counsel presented their closing arguments, and the court charged the jury.

The jury determined defendant breached its contract with plaintiff by failing to pay for services performed and defendant's breach proximately caused plaintiff to suffer damages in the amount of $35,576.94. The jury also found defendant failed to prove plaintiff breached the contract by failing to perform

the required work. The court entered a judgment reflecting the jury's verdicts. Defendant appealed from the court's order.[1]

## II.

Defendant argues the court erred by involuntarily dismissing its CFA counterclaim against plaintiff and its third-party CFA claims against Mark Ciullo and Ryan Ciullo. Defendant asserts the court erred by finding the CFA inapplicable to the transaction between plaintiff and defendant. Defendant also claims the court incorrectly concluded it did not present evidence establishing an ascertainable loss proximately caused by plaintiff's, Mark Ciullo's, and Ryan Ciullo's alleged unconscionable business practices. Last, defendant claims it presented sufficient evidence Mark Ciullo and Ryan Ciullo engaged in unconscionable business practices and the court erred by finding otherwise.

We review a decision dismissing a claim under Rule 4:37-2(b) and Rule 4:40-1, applying the same standard as the trial court.[2] Smith v. Millville Rescue

---

[1] The jury also rendered verdicts on defendant's breach of contract claim against MacIntyre and MacIntyre's breach of contract claims against defendant, but we do not address those verdicts because they are not at issue on appeal.

[2] It is unclear if the court granted plaintiff's motion dismissing the CFA claims under Rule 4:37-2(b), Rule 4:40-1, or both. Given our conclusion the CFA claims were properly dismissed after the presentation of all the evidence concerning defendant's CFA claim, see Rule 4:40-1, it is unnecessary to

Squad, 225 N.J. 373, 397 (2016). In both motions, we apply "'the same evidential standard: "if, accepting as true all the evidence which supports the position of the party defending against the motion and according him [or her] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied."'" Ibid. (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)). A motion made under either Rule "should only 'be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action.'" Ibid. (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)).

We first address the court's dismissal of the CFA claim based on its finding the transaction did not fall within the CFA's definition of "merchandise." More particularly, the court found the nature of the transaction rather than the identity of the purchaser determines the CFA's applicability, and transactions involving merchandise that is not generally sold to the public at large fall outside the CFA's protections. The court found the transaction at issue here—the pouring of thousands of pounds of concrete to support a metal frame building in

---

separately consider whether the record before the court following defendant's presentation of its evidence on the CFA claim supported an involuntary dismissal of the claim under Rule 4:37-2(b).

winter temperatures into a continuous 17,500 square foot area, with a tolerance of one inch per 100 feet—is not an activity that is marketed to the public at large. The court also noted the involvement of other contractors in directing plaintiff's work and the contractual requirement that plaintiff perform its work in accordance with the plans as directed by Nel-Struct.

Although the CFA's original purpose was to "combat 'sharp practices and dealings' that victimized consumers by luring them into purchases through fraudulent or deceptive means," Cox v. Sears Roebuck & Co., 138 N.J. 2, 16 (1994) (quoting D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 23 (App. Div. 1985)), the CFA "protect[s] the public even when a merchant acts in good faith," D'Ercole Sales, 206 N.J. Super. at 23.

To sustain a cause of action under the CFA, "a plaintiff [must] prove three elements: '1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss.'" D'Agostino v. Maldonado, 216 N.J. 168, 184 (2013) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009)).

An "unlawful practice" is defined as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any

12

material fact with intent that others rely upon such concealment, suppression or omission, <u>in connection with the sale or advertisement of any merchandise</u> or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

[N.J.S.A. 56:8-2 (emphasis added).]

N.J.S.A. 56:8-1(c) defines "merchandise" to "include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  At issue here is the court's determination plaintiff's and defendant's agreement for plaintiff to supply concrete contracting services did not constitute a sale of merchandise under the CFA.

"[I]t is well established that the CFA is applicable to commercial transactions," but "context is important."  <u>All the Way Towing, LLC v. Bucks Cty. Int'l, Inc.</u>, 236 N.J. 431, 443 (2019).  "In business-to-business transactions it is the 'nature of the transaction' that will determine whether it can fit within the CFA's definition of 'merchandise."  <u>Id.</u> at 447.

In <u>All the Way Towing</u>, the Court addressed business-to-business transactions that are not within the CFA's definition of merchandise.  The Court described our decisions in <u>Finderne Management Co. v. Barrett</u>, 402 N.J. Super. 546 (App. Div. 2008) and <u>Princeton Healthcare System v. Netsmart New York,</u>

Inc., 422 N.J. Super. 467 (App. Div. 2011), as examples of courts "examin[ing] with care the nature of the transaction when customized products and commercial entities are involved in a private individual CFA claim." All the Way Towing, 236 N.J. at 446.

The Court explained that in Finderne, we determined a plaintiff's participation in a "tax-deductible vehicle to fund pre-retirement death benefits" did not constitute merchandise under the CFA because the contract included a disclosure document and recommendation to consult with a tax attorney; the transaction actually consisted of a series of complex transactions; and the buyers were not "unsophisticated" and "were informed through advice from an accountant and an attorney." Id. at 445-46 (quoting Finderne, 402 N.J. Super. at 571-72). The Court also noted our conclusion that the service in Finderne "did not fit within the CFA because [it] was not 'of the type sold to the general public.'" Id. at 446 (quoting Finderne, 402 N.J. Super. at 570).

In All the Way Towing the Court further observed that in Princeton Healthcare we focused on the nature of the transaction and found a contract for an upgrade of a computer system "did not constitute a simple purchase of computer software sold to the public at large," in part because the system's purchaser requested proposals that were prepared with the assistance of a

consultant. Ibid. (quoting Princeton Healthcare, 422 N.J. Super. at 473). The Court also noted our conclusion that the transaction did "not constitute a 'sale of merchandise'" under the CFA because it involved a "heavily negotiated contract between two sophisticated corporate entities." Ibid. (quoting Princeton Healthcare, 422 N.J. Super. at 474).

The Court rejected the claim that our decisions in Finderne and Princeton Healthcare limited the application of the CFA in business-to-business transactions. Id. at 447. The Court explained that in those cases "it was the nature of the transaction between the two business entities that precluded CFA protection." Ibid. To promote efficiency "in assessing the nature of a transaction in a business-to-business setting," the Court established the following four criteria to be considered in determining whether "the CFA will apply to the merchandise":

> (1) the complexity of the transaction, taking into account any negotiation, bidding, or request for proposals process; (2) the identity and sophistication of the parties, which includes whether the parties received legal or expert assistance in the development or execution of the transaction; (3) the nature of the relationship between the parties and whether there was any relevant underlying understanding or prior transactions between the parties; and . . . (4) the public availability of the subject merchandise.
>
> [Id. at 447-48.]

15

In our analysis of the All the Way Towing factors, we turn first to the second factor by noting that defendant, through its president, Himmelstein, was a sophisticated party that chose to engage in a sophisticated endeavor. Himmelstein admitted he served as the general contractor on the project, directing work on the construction of a commercial building with a 17,500 square footprint and a second story mezzanine, and coordinating the work of the many subcontractors he employed on the job. He had done this work before. He had been previously involved in the construction of furniture stores, and he listed himself as the general contractor on the building permit for the Manahawkin store.

Like the purchasers in Finderne and Princeton Healthcare, Himmelstein's negotiation of the contract "[was] informed through [the] advice" of professionals, id. at 446 (quoting Finderne, 402 N.J. Super. at 571) (noting the seller in Princeton Healthcare relied on a computer consultant and legal counsel in entering into the transaction), including an architect, civil engineer and a structural engineer, in formulating plans for the construction of the building, obtaining approvals, and defining the terms of plaintiff's contract with defendant. See All the Way Towing, 236 N.J. at 448 (explaining an individual consumer transaction was for merchandise under the CFA in part because there

A-1077-17T2

were no experts or attorneys consulted).  Defendant required, and plaintiff's proposal included, the condition that plaintiff supply concrete and its services in accordance with plans provided by the structural engineer, Nel-Struct, that was designated by defendant.

Defendant argues that in Coastal Group, Inc. v. Dryvit Systems, Inc., 274 N.J. Super. 171, 174-75 (App. Div. 1994), we determined the sale of a product, prefabricated wall system panels, was within the protections of the CFA even though the purchaser "engaged professional architects and engineers in the construction project at issue."  Our holding in Coastal Group, however, was not in any manner dependent on the involvement, or lack of involvement, of professionals in the transaction.  We determined only that the trial court erred by dismissing the CFA claim based on its finding the CFA "does not apply to products . . . which are not available to the average consumer," id. at 175, and we explained "the protections of the [CFA] extend to the purchase of merchandise for use in business operations," id. at 179.

Turning to the first of the All the Way Towing factors, we also find that although the contract may not have been as "heavily negotiated" and for as long a period as the one at issue in Princeton Healthcare, 422 N.J. Super. at 473-74, it nonetheless was discussed during many conversations between sophisticated

business parties, with defendant relying on professionals to define the contract's terms.

In addition, like the transaction at issue in Princeton Healthcare, plaintiff's and defendant's transaction "did not constitute a simple purchase of [a product] sold to the public at large." All the Way Towing, 236 N.J. at 446 (quoting Princeton Healthcare, 422 N.J. Super. at 473). Defendant did not simply buy concrete from plaintiff. The transaction required plaintiff to provide goods and services, including a monolithic pour of concrete, to exacting standards prescribed by a structural engineer. As detailed by Himmelstein, plaintiff was required to perform ten different services that were essential to the timely completion of a substantial commercial construction project.

Defendant's bidding and request for proposal process did not consist of mere acceptance of plaintiff's proposal in September 2012. Himmelstein sought referrals for concrete contractors from those he considered knowledgeable and spoke with three or four other contractors before selecting plaintiff. Moreover, Himmelstein and Ryan Ciullo discussed the transaction during "a lot" of conversations before Himmelstein signed the proposal in September 2012. The proposal required that plaintiff provide its services in conformity with Nel-

18

Struct's plans, but the final plans were not actually provided until November 2012, and that is when the proposal was executed on plaintiff's behalf.

The transaction was also subject to further negotiations following plaintiff's and defendant's initial agreement. During the course of the project, the terms of the transaction changed based on ongoing discussions between the parties and plaintiff's reliance on the consultants. In January 2013, the parties agreed on a change in price for concrete, and there were subsequent change orders allowing plaintiff reimbursement for additional pumping equipment for the monolithic pour and later for the addition of the fiber mesh to the mezzanine concrete. These changes reflect ongoing discussions and negotiations to complete the transaction.

The "nature of the relationship between the parties" is also a factor in determining whether the transaction involves merchandise falling within the CFA. All the Way Towing, 236 N.J. at 447-48. Plaintiff and defendant did not have any "prior transactions," ibid., but their relationship during the transaction was that of a general contractor and a sub-contractor on a commercial construction project. As Himmelstein explained, he was the general contractor on plaintiff's construction project, and on its behalf he was responsible for

directing the work that was the subject of the transaction upon which defendant's CFA claim is founded.

We also consider the "public availability of the subject merchandise." Id. at 448. The Court defined the public availability requirement "when evaluating a private individual CFA action" as follows: the requirement "can be met by showing that any member of the public could purchase the product or service, if willing and able, regardless of whether such a purchase is popular." Id. at 447. However, the Court noted that it did "not suggest that all business-to-business transactions automatically fit the intendment of a sale offered to the public." Id. at 443. The Court further explained that it did not need to "plumb such limits" because the "plaintiffs, as interested members of the public," purchased the tow truck at issue "for their own use" and the "nub of issue" presented to the Court "focus[ed] on the good in question." Ibid.

Here, although in theory any member of the public with sufficient funds could purchase the goods and services plaintiff provided to defendant, we are not convinced the nature of this business-to-business transaction supports a conclusion the good and services were publicly available within the meaning of the CFA. In Finderne, we observed that "[t]o qualify as a consumer transaction, which is not defined in the CFA, the challenged services generally must be of

A-1077-17T2

the type sold to the general public," 402 N.J. Super. at 570, and we noted "[t]he entire thrust of the [CFA] is pointed to products and services sold to consumers in the popular sense," ibid. (citation omitted).

Similarly, in Princeton Healthcare, we explained the definition of "merchandise" under the CFA includes "'any objects, wares, [goods], commodities, services or anything offered, directly or indirectly to the public for sale.'" 422 N.J. Super. at 473 (quoting N.J.S.A. 56:8-1(c) (emphasis in original)). We further found "that 'the public,' as used in this definition of 'merchandise,' refers to 'the public at large.'" Ibid. (quoting Finderne , 402 N.J. Super. at 570).

In All the Way Towing, the Court found the fact that a product or service is not "typically sold to 'public at large' does not mean [it is] not offered 'to the public for sale'" under the CFA. Id. at 448. However, in finding the tow truck purchase at issue constituted the sale of merchandise that was publicly available under the CFA, the Court explained that the transaction involved a "direct consumer purchase transaction" with "no attorneys or other experts . . . involved." Ibid.

Here, in contrast, the goods and services plaintiff agreed to provide were to satisfy the requirements of a general contractor on a large commercial

building project in accordance with plans and specifications developed by experts designated and relied upon by defendant. Considering, as we must, the nature of the transaction, the goods and services at issue are not those generally sold to the general public or the public at large. To the contrary, the nature of the goods and services provided pursuant to the transaction are those that would be exclusively provided, as they were here, as part of a subcontract on a large and complex commercial construction project.

In sum, none of the All the Way Towing criteria support a finding the goods and services provided by plaintiff constitute merchandise within the protection of the CFA. We are therefore convinced that based on the nature of the transaction between plaintiff and defendant, the court correctly determined defendant did not present sufficient evidence supporting its CFA cause of action against plaintiff, Mark Ciullo, and Ryan Ciullo.[3]

### III.

Defendant next argues the court erred by admitting into evidence an April 7, 2013 letter from Nelson, the Nel-Struct representative, to "Walter,"

---

[3] Because we conclude defendant did not present sufficient evidence establishing a CFA cause of action, it is unnecessary to address defendant's arguments that the court erred by finding defendant did not present sufficient evidence establishing an ascertainable loss or that Mark Ciullo and Ryan Ciullo engaged in unconscionable practices.

Stephlynn's representative on the project. The letter, which consists of a single sentence and is printed on Nel-Struct letterhead, states the mezzanine deck "can either use [wire mesh] or fiber [] mesh for reinforcement." Defendant claims the court erred by admitting the letter because it was not properly authenticated and there was no evidence supporting the court's finding the letter constituted a business record under N.J.R.E. 803(c)(6). Plaintiff does not address defendant's authenticity argument and does not dispute that the court erred by finding the letter was admissible as a business record. Instead, plaintiff generally asserts the letter "did not constitute hearsay," but nonetheless claims the letter was admissible under the hearsay rule exceptions for adoptive statements of a party opponent under N.J.R.E. 803(b)(3) and (4).

"A trial court's ruling on the admissibility of evidence is reviewed on appeal for abuse of discretion." State v. Rose, 206 N.J. 141, 157 (2011). Under this standard, the trial court's decision to allow evidence should not be overturned "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide [of] the mark that a manifest denial of justice resulted." State v. Lykes, 192 N.J. 519, 534 (2007) (alteration in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 34 (2004)). If the trial court does not determine the admissibility of evidence under the correct legal

23

standard, however, its decision is not afforded any deference and we review the issue de novo. State v. Reddish, 181 N.J. 553, 609 (2004).

Prior to addressing defendant's arguments challenging the court's admission of the letter into evidence, we summarize the trial testimony concerning the letter. Ryan Ciullo first testified he "believed" plaintiff received the letter "through Walter from [Stephlynn] . . . or Himmelstein," but initially he did not offer any other information concerning plaintiff's receipt of the letter. During his trial testimony, Himmelstein had denied receiving or seeing the letter at any time prior to the litigation.

Defendant's counsel objected to the letter's admission, arguing it was not properly authenticated. The court asked defense counsel if he was aware of any basis to believe the letter was not "reliable." The court also confirmed with plaintiff's counsel that he did not seek admission of the letter to establish the truth of its singular assertion, but that he sought the letter's admission to establish only that plaintiff received it and "acted upon the opinion" expressed in it. Without any further argument, and without making any findings, the court declared the letter was a "business record" and admitted it under N.J.R.E. 803(c)(6).

Ryan Ciullo also offered additional testimony supporting the letter's authenticity. He explained that as plaintiff planned the pouring for the mezzanine, he told Himmelstein the Nel-Struct plans did not include a requirement that the concrete include wire mesh, or any other, reinforcement. According to Ciullo, he told Himmelstein to raise the issue with the engineer, which the trial evidence showed was Nel-Struct, because plaintiff "wanted the blessing of" the engineer before pouring the mezzanine concrete.

Ciullo testified he "told Himmelstein, go to [Nel-Struct], [it's] your engineer, and make sure, . . . what we're doing is the right thing because [we're] not engineers and we don't propose what kind of reinforcing goes on a building and that's what [Himmelstein] did and that's how [plaintiff] got the [April 7, 2013] letter," which said "use fiber mesh or wire" for reinforcement.[4] Ciullo also explained that as a result of his conversation with Himmelstein and his receipt of the letter, he forwarded the change order for the addition of fiber mesh to Himmelstein, and Himmelstein approved the change order on May 4, 2013.

Based on that record, we first consider defendant's claim plaintiff failed to satisfy its burden of authenticating the letter. "[A] writing must be properly

---

[4] On cross-examination, Ciullo testified that he received the April 7, 2013 letter as an attachment to an email, but he could not identify the email.

authenticated before it is admitted into evidence." State v. Marroccelli, 448 N.J. Super. 349, 364 (App. Div. 2017). N.J.R.E. 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims."

The burden of establishing authentication "was not designed to be onerous." State v. Hockett, 443 N.J. Super. 605, 613 (App. Div. 2016). Thus, "[a]uthentication 'does not require absolute certainty or conclusive proof,'" but instead requires "only 'a prima facie showing of authenticity.'" State v. Hannah, 448 N.J. Super. 78, 89 (App. Div. 2016) (quoting State v. Tormasi, 443 N.J. Super. 146, 155 (App. Div. 2015)). Authenticity may be demonstrated by direct evidence, id. at 90, such as testimony from the person who authored the writing, see State v. Moore, 158 N.J. Super. 68, 83 (App. Div. 1978), or witnessed the document's execution, see Marroccelli, 448 N.J. Super. at 364-65. Authentication may also be established by circumstantial evidence, Hannah, 448 N.J. Super. at 90, including, for example, by "'evidence establishing that it was sent in reply to a previous communication,'" ibid. (quoting State v. Mays, 321 N.J. Super. 619, 629 (App. Div. 1999)), or by evidence "'divulg[ing] intimate

knowledge of information which one would expect only the person alleged to have been the writer or participant to have,'" ibid. (citation omitted).

Here, plaintiff bore the burden of presenting some evidence the April 7, 2013 letter was what it purported to be: correspondence from the engineer responsible for the structural plans for the concrete explaining that the reinforcement for the mezzanine concrete could be either wire mesh or fiber mesh. Recognizing "the low burden imposed by our authentication rules," id. at 91, we conclude the trial record supports a finding the letter was properly authenticated by circumstantial evidence.

Ciullo's testimony established that he spoke with Himmelstein about plaintiff's request for direction from Nel-Struct concerning a very precise issue: what type of reinforcement was required for the mezzanine concrete? Plaintiff subsequently received the April 7, 2013 letter addressing the exact issue for which plaintiff requested that Himmelstein obtain direction from Nel-Struct. In addition, following Ciullo's conversation with Himmelstein, Ciullo's request that Himmelstein obtain direction from Nel-Struct, and plaintiff's receipt of the April 7, 2013 letter from Nel-Struct, Himmelstein agreed without objection to a change order adding the fiber mesh the letter stated was acceptable.

The totality of those circumstances supports a reasonable inference the letter was authored by Nelson on behalf of Nel-Struct to address the issue for which Ciullo requested Himmelstein obtain direction. In addition, like a writing that includes information which one could expect only the author to have, see Mays, 321 N.J. Super. at 629, the limited and precise statement in the April 7, 2013 letter reveals knowledge of the very specific issue Ciullo requested Himmelstein have Nelson address, and the letter solely addresses that issue. In our view, the circumstances demonstrate a prima facie showing the letter is what it purports to be: a statement by the structural engineer that plaintiff used to provide the project's structural plans that either wire mesh or fiber mesh could be used as reinforcement of the mezzanine. The letter was properly authenticated under N.J.R.E. 901.

We next address the parties' arguments, and the court's conclusion, concerning the application of the exceptions to the hearsay rule, N.J.R.E. 802, purportedly supporting admission of the April 7, 2013 letter into evidence. As noted, the court admitted the letter as a business record under N.J.R.E. 803(c)(6), and on appeal plaintiff argues for the first time the letter was admissible as an adopted statement of party under N.J.R.E. 803(b)(3) and (4).

28

The record shows that, prior to admitting the letter into evidence, the court confirmed with plaintiff's counsel the letter was not offered to prove the truth of the statement that the mezzanine deck "can either use [wire] or fiber[]mesh for reinforcement." Instead, the letter was expressly offered only to prove plaintiff received the letter and, in response, decided with Himmelstein's subsequent approval to use fiber mesh. Thus, because the letter was not "offered in evidence to prove the truth of the matter asserted," N.J.R.E. 801(c), it did not constitute hearsay, was not subject to the prohibition in the hearsay rule, N.J.R.E. 802, and did not require an exception to the hearsay rule permitting its admission into evidence. See State v. Kuropchak, 221 N.J. 368, 387 (2015) (explaining "[h]earsay is inadmissible unless it falls into one of the recognized exceptions"). Moreover, consistent with the letter's admission for that limited purpose, plaintiff asserted only that it relied on the letter for its submission of the change order to Himmelstein for the addition of the fiber mesh to the mezzanine concrete.

We are therefore convinced the court did not abuse its discretion by admitting the April 7, 2013 letter into evidence. The letter was authenticated in

accordance with N.J.R.E. 901 and did not constitute inadmissible hearsay under N.J.R.E. 802.[5]

Our determinations render it unnecessary to address the merits of defendant's remaining arguments. Defendant asserts the court erred by applying the economic waste doctrine to dismiss a portion of its damage claim on its breach of contract cause of action, but the jury determined defendant failed to prove plaintiff breached the contract and defendant offers no basis to reverse the jury's determination. As a result, defendant's argument is moot because any decision we might render on the merits of the court's application of the economic waste doctrine "can have no practical effect on the existing controversy." Redd v. Bowman, 223 N.J. 87, 104 (2015) (citations omitted).

---

[5] It is unnecessary to address the court's determination the letter constituted a business record under N.J.R.E. 803(c)(6), other than to note that "[t]o qualify as a business record, . . . a writing must meet three conditions: it must be made in the regular course of business, within a short time of the events described in it, and under circumstances that indicate its trustworthiness." State v. Kuropchak, 221 N.J. 368, 387-88 (2015). The record is devoid of any evidence establishing the elements required to permit the letter's introduction under the Rule. In addition, although it is also unnecessary to address plaintiff's claim the letter was admissible under N.J.R.E. 803(b)(3) and (4), we would not otherwise consider the argument because it was not raised before the trial court. See Zaman v. Felton, 219 N.J. 199, 226-27 (2014) (explaining appellate courts generally decline to address arguments that were not presented to the trial court and are not related to jurisdiction or issues of public concern).

Similarly, defendant's remaining argument—that defendant's breach of contract claim should be reinstated if its CFA claim is reinstated—is mooted by our determination the court properly dismissed the CFA claim. To the extent we have not expressly addressed any of defendant's remaining arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31